**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL–CIO; Local 726, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO; New Jersey Environmental Protection Federation; Randall Green; John Kozic, Jr.; Edward M. Stromko; Edward L. Majewski; and New Jersey Industrial Union Council, Plaintiffs,**

v.

**AMERACE CORP., INC., Defendant,**

and

**HARVARD INDUSTRIES, INC.,**
**Defendant/Counterclaim Plaintiff,**

v.

**NEW JERSEY ENVIRONMENTAL FEDERATION, Counterclaim Defendant.**

Civ. A. No. 86–1833.

United States District Court,
D. New Jersey.

July 5, 1990.

Ball, Livingston & Tykulsker by David Tykulsker, Newark, N.J., for plaintiffs.

Sheldon Schachter, Union, N.J., for defendant Harvard Industries, Inc.

## OPINION

DEBEVOISE, District Judge.

On November 3, 1989, plaintiffs filed a motion for partial summary judgment on the issue of the liability of Harvard Industries, Inc. ("Harvard") for Clean Water Act ("Act") violations at its Elastic Stop Nut of America plant ("ESNA") in Union, New Jersey. Specifically, plaintiffs seek summary judgment on the issue of Harvard's liability for alleged violations of effluent discharge limitations promulgated by the Environmental Protection Agency ("EPA"), 40 C.F.R. §§ 413.14, 433.15, and by the Joint Meeting of Essex and Union Counties ("Joint Meeting"), 40 C.F.R. § 403.5.[1] Plaintiffs also seek summary judgment on the issue of Harvard's liability for failing to report numerous federal and local wastewater discharge violations, including violations of the Joint Meeting limitation for hexavalent chromium. Finally, plaintiffs seek a preliminary injunction to prevent additional Clean Water Act violations at ESNA.

On December 18, 1989, Harvard filed a cross-motion for summary judgment and litigation costs. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), Harvard seeks a dismissal of the second amended complaint with prejudice.

## BACKGROUND

On May 12, 1986, plaintiffs initiated this citizen suit pursuant to section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), authorizing citizens to commence

---

**1.** The Joint Meeting is a partnership of Union County and Essex County municipalities that operates a publicly owned treatment works.

civil actions on their own behalf "against any person ... who is alleged to be in violation of ... an effluent standard or limitation under" the Clean Water Act. Plaintiffs seek injunctive relief and civil penalties for violations of local and federal effluent pretreatment standards.[2]

The complaint has been amended twice. On January 13, 1989, Harvard's motion to dismiss the amended complaint was denied. On October 17, 1989, all claims for alleged violations occurring before Harvard purchased ESNA on April 12, 1985 were dismissed pursuant to Rule 12(b)(6).

Plaintiffs note that ESNA is subject to EPA's general pretreatment regulations for existing electroplating and metal finishing point sources because it discharges wastewater into the publicly owned treatment works ("POTW") of the Joint Meeting. Plaintiffs also note that ESNA is subject to the rules and regulations of the Joint Meeting and the terms of its Joint Meeting permit. Plaintiffs claim that sampling results since January 30, 1980 disclose that ESNA's wastewater has regularly contained concentrations of pollutants in violation of the Clean Water Act. 33 U.S.C. § 1317. Specifically, plaintiffs assert that Harvard's discharges have continuously been in excess of national electroplating and metal finishing categorical pretreatment standards, promulgated by EPA pursuant to 40 C.F.R. § 403.6 (*i.e.*, 40 C.F.R. §§ 413.14 and 433.15, respectively), and Joint Meeting discharge limitations, including the maximum daily discharge limitation for hexavalent chromium, promulgated pursuant to 40 C.F.R. § 403.5(c). Plaintiffs also claim that Harvard has violated its Joint Meeting permit and 40 C.F.R. § 403.12 by failing to report numerous federal and Joint Meeting violations.

**2.** Plaintiffs seek penalties under 33 U.S.C. § 1319(d) not to exceed $10,000 per day for each violation of section 307 of the Clean Water Act, 33 U.S.C. § 1317. The 1987 Clean Water Act amendments increased the maximum civil penalty to $25,000 per day for each violation. 33 U.S.C. § 1319(d) (Supp.1989). Civil penalties awarded in citizen suits are payable to the United States Treasury. *See Gwaltney of Smithfield,*

## FACTS

Harvard, an indirect discharger or "industrial user," 40 C.F.R. § 403.3(h), manufactures metal fasteners and engages in electroplating and metal finishing operations at ESNA. As a result of these operations, since May 1985 ESNA has discharged more than 10,000 gallons of wastewater per day into the Joint Meeting POTW. 6/6/90 Von Linden Affidavit, ¶ 1. ESNA's maximum wastewater discharge is 25,000 gallons per day. 12/8/89 Appelbaum Affidavit, ¶ 5. The POTW's total influent is 65 million gallons per day. *Id.*

### A. *Joint Meeting Rules and Regulations*

On December 20, 1984, the Joint Meeting adopted the "Joint Meeting of Essex and Union Counties Rules and Regulations" ("rules and regulations"). Plaintiffs' Brief, Exhibit 1. The rules and regulations list the maximum daily concentrations of certain pollutants, including hexavalent chromium, which are allowable in an indirect discharger's wastewater. *Id.*, Article III, § 4. Maximum monthly average concentrations were listed until these were repealed on January 31, 1987. *Id.;* 11/3/89 Bell Affidavit, ¶ 10. Also, under the rules and regulations industrial users cannot operate without a non-domestic wastewater discharge permit. *Id.*, Article V, § 1. Such permits are "expressly subject to all provisions of the[ ] rules and regulations." *Id.*, Article V, § 4(A); *see also id.*, Article X ("All users of the wastewater facilities shall comply with the requirements of the written rules and regulations of the ... Joint Meeting").

### B. *Joint Meeting Permits*

On May 15, 1985, Harvard was issued a Joint Meeting discharge permit (Permit JM 7030) ("permit").[3] Plaintiffs' Brief, Exhibit

*Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

**3.** The more stringent of the Joint Meeting and EPA limitations which are applicable to ESNA's discharges are identified in Table I to this opinion.

2. The permit and all revisions specify discharge limitations for certain pollutants and provide that Harvard is subject to all Joint Meeting rules and regulations. *Id.*, Exhibits 2–5. Some pollutants such as hexavalent chromium which are listed in the rules and regulations are not included in ESNA's permit.

The permit initially required sampling both at "the pits located at the pretreatment area" and at the "settling tank in the tumbling area." *Id.*, Exhibit 2. Initially, the permit also required quarterly sampling and semiannual reporting and provided that in addition to the Joint Meeting's regulations Harvard was subject to both the federal electroplating and metal finishing categorical pretreatment standards. *Id.* The permit's revisions have not provided that Harvard is subject to the federal electroplating standards.

On May 8, 1986, Harvard was notified that its permit had been reissued effective April 15, 1986. The expiration date was extended to April 14, 1991. *Id.*, Exhibit 3. This revision required both semiannual sampling and reporting. Also, it provided for sampling at the "treated effluent discharge pit" and at the "final settling pit after the tumbling operation," and it included adjusted discharge limitations for total and amenable cyanide based on the combined wastestream formula ("CWF").[4] *Id.*

On July 21, 1986, Harvard was notified that the permit had been revised again, effective April 15, 1986. At Harvard's request, this second revision applied the combined wastestream formula to all metal finishing parameters. The "Joint Meeting manhole" or "the manhole on the lawn by

the air conditioner" was designated as the sampling site. *Id.*, Exhibit 4.

Finally, on August 12, 1988, Harvard was notified that effective August 15, 1988 ESNA's permit would be revised based on updated flow data. *Id.*, Exhibit 5. Harvard notes that prior to this revision the Joint Meeting permit did not require monthly averages. 12/5/89 Von Linden Affidavit, ¶ 3(A)(v). The permit defines "monthly average" as "[t]he average of all daily samples taken in a calendar month from 1 sample to as many as 31 samples. The frequency of monitoring shall depend on the Permittee's confidence in meeting the monthly average within one daily sampling event or more frequent daily sampling events." Plaintiffs' Brief, Exhibit 5.

### C. Sampling

In November 1986, Harvard notified the Joint Meeting that it was instituting a weekly sampling program. Plaintiffs' Brief, Exhibit 14 (11/24/86 letter from ESNA to the Joint Meeting). According to plaintiffs, until November 1989 Harvard in fact generally monitored its wastewater on a weekly basis. 11/3/89 Bell Affidavit, ¶ 14; 3/12/90 Bell Affidavit, ¶ 8.

ESNA produces three separate wastestreams (*i.e.*, the plating department, tumbling department and sanitary wastestreams) that combine at the Joint Meeting manhole. Since 1985, ESNA has analyzed numerous wastewater samples taken at the Joint Meeting manhole and at other locations designated by Harvard's laboratory as the "main sewer," "DMP system," and "plating department."[5] These three sites are downstream from the chemical waste treatment system but upstream from the Joint Meeting manhole. Thus, samples

---

**4.** EPA promulgated the combined wastestream formula in its general pretreatment regulations. 40 C.F.R. § 403.6(e). The combined wastestream formula adjusts the categorical pretreatment standards "[w]here process effluent is mixed prior to treatment with wastewaters other than those generated by the regulated process." 40 C.F.R. § 403.6(e); *see National Ass'n of Metal Finishers v. Environmental Protection Agency*, 719 F.2d 624, 650 (3d Cir.1983).

**5.** At different times, two private laboratories have analyzed Harvard's wastewater: Analytical Testing Laboratory ("ATL") and Chyun Associates ("Chyun"). ATL drew samples from the main sewer, DMP system and plating department sites as well as from the Joint Meeting manhole. Chyun drew samples from the combined wastestream at the "combined waste flow (manhole)" (*i.e.*, the Joint Meeting manhole) and from the plating department wastestream at the "pit by the treatment plant" (*i.e.*, the main sewer).

taken from the DMP system or the plating department sites can be treated as having been taken at the main sewer. 3/12/90 Bell Affidavit, ¶¶ 6–7; *see also* 7/19/89 Von Linden Deposition at 48–49 (ESNA's vice president of operations, Edwin Von Linden, indicated that main sewer samples are representative of plating department discharges).

ESNA uses two procedures for collecting samples: *i.e.*, grab sampling and composite sampling. These procedures are mandated by EPA and the Joint Meeting. "A grab sample is an individual sample collected over a period of time not exceeding 15 minutes." 40 C.F.R. § 403.7(b)(2)(iv). A composite sample is a flow-proportional sample collected over a 24–hour period. 40 C.F.R. § 403.7(b)(2)(iii). In addition, different preservation techniques are used to prepare a sample for analysis depending on whether it is a grab sample or a composite sample. Grab samples are used for analyzing cyanides. Composite samples are used for analyzing metals.

Harvard asserts that all samples analyzed for permit compliance purposes since July 1986 have been taken from the Joint Meeting manhole.[6] 12/5/89 Von Linden Affidavit, ¶ 3(B)(i). Harvard notes that a number of sample analysis reports relied upon by plaintiffs to demonstrate violations are based on grab samples and purport to set forth measurements for both cyanides and metals. *Id.*, ¶ 3(b)(iii). Harvard further states that such sample analysis reports are based on samples taken at the main sewer because reports containing analysis results for both cyanides and metals were not prepared for samples taken at the Joint Meeting manhole.[7] *Id.*

Harvard asserts that main sewer samples were taken for internal monitoring purposes only. *Id.* Harvard asserts that because the collection and preservation

techniques for grab samples and composite samples are different, main sewer samples cannot be used to determine compliance with either federal or local standards. *Id.* In addition, Harvard asserts that main sewer samples cannot be used to determine permit compliance because "at times the system is recycling when the test is taken [sic] and therefore the wastewater is not even entering the POTW." 2/9/90 Von Linden Affidavit, ¶ 8.

Harvard's challenge to the use of main sewer sample reports, however, is not consistent with its other assertions. For example, on March 23, 1989, Harvard submitted four samples purportedly demonstrating permit compliance even though these samples were taken at the main sewer. Also, assuming that main sewer samples were taken only for internal monitoring purposes, Harvard fails to explain why a substantial number of these are certified samples rather than less expensive noncertified samples. 7/8/88 Banhidi Deposition at 18–19. Finally, Harvard fails to explain why certified grab samples were analyzed for metals when any results would be inaccurate. *Id.* at 25–26. Presumably, inaccurate measurements are no more useful for internal monitoring purposes than for reporting purposes.

## D.  *Violations*

Taking into account Harvard's assertion that main sewer samples were drawn upstream from the Joint Meeting manhole, plaintiffs calculated the number of Harvard's daily and monthly discharge violations. 1/18/90 Bell Affidavit, Table I. For Joint Meeting manhole samples, plaintiffs' expert Dr. Bruce A. Bell, senior vice president of Carpenter Environmental Associates, Inc., an environmental engineering and science consulting firm, applied the

---

**6.** However, on at least one occasion Harvard used main sewer samples to demonstrate permit compliance. On March 23, 1989, Harvard submitted four main sewer samples as evidence of compliance with the limitations for cyanides and cadmium. Plaintiffs' Brief, Exhibit 7.

**7.** To complicate matters, some sample analysis reports were mislabeled. The samples taken at

the main sewer were labeled correctly. Certain samples taken at the Joint Meeting manhole, however, were incorrectly labeled "main sewer" samples. As Joint Meeting manhole samples, these samples are not subject to the alleged infirmities which Harvard attributes to the samples taken at the main sewer.

CWF–adjusted discharge limits. For main sewer samples, Bell applied the non-adjusted discharge limits. *Id.*, ¶¶ 9–12.

Table I of Bell's January 1990 affidavit indicates that on 58 days since January 1, 1986 Harvard committed 89 violations of daily limitations. Table II of Bell's January 1990 affidavit indicates that between March 1986 and July 1989 Harvard violated one or more monthly limitations in 25 of the 30 months for which Bell had data. Finally, Exhibit A of Bell's March 12, 1990 affidavit indicates that between October 1, 1989 and January 31, 1990, ten samples contained 16 daily violations. Bell concluded that Harvard's "compliance record has not been improving ... chiefly with regard to cyanide and cadmium." *Id.*, ¶ 14.

Plaintiffs also identified a number of daily violations which ESNA failed to report. Plaintiffs' Brief at 14. In addition, ESNA's sample analysis reports and periodic compliance reports indicate that it failed to report numerous valid monitoring results.

Von Linden testified that between July 1986 and October 10, 1989, 66 Joint Meeting manhole samples were analyzed for cyanides. 12/5/89 Von Linden Affidavit, ¶ 3(C)(ii). However, Exhibit A of Von Linden's December 1989 affidavit indicates that during this period only 60 Joint Meeting manhole samples were analyzed for cyanides. Harvard concedes that between July 18, 1986 and August 14, 1988, of 38 samples that were analyzed for cyanides there were 12 violations of the total cyanide limit and 9 violations of the amenable cyanide limit. *Id.*, ¶ 3(C)(ii). Harvard disputed one amenable cyanide violation. *Id.* Between August 15, 1988 and October 10, 1989, of another 22 samples that were analyzed for cyanides Harvard concedes that there were 4 total cyanide violations and 5 amenable cyanide violations. *Id.* Von Linden asserted that 6 of these cyanide violations occurred in January 1989 because of a mechanical problem, and he noted that Harvard disputed another amenable cyanide violation. *Id.*, ¶ 3(C)(v).

Von Linden also testified that between July 18, 1986 and October 10, 1989, 50 samples were analyzed for cadmium. *Id.*,

3(C)(iii). However, Exhibit A of Von Linden's December 1989 affidavit indicates that during this period 52 samples were analyzed for cadmium. Of 34 samples analyzed for cadmium between July 21, 1986 and August 14, 1988, Harvard concedes that there were 4 violations of the cadmium limit. *Id.*, Exhibit A. Of 18 samples that were analyzed for cadmium between August 15, 1988 and October 10, 1989, Harvard concedes that there were another 2 violations of the cadmium limit. *Id.* Von Linden asserted that one of these violations was caused by a mechanical problem. *Id.*, Exhibit J.

Von Linden concluded that "Harvard's record shows continued attempts at compliance [sic] and since June 1988, it is my feeling that Harvard is now in compliance." 12/5/89 Von Linden Affidavit, ¶ 3(C)(viii).

### E. *Hexavalent Chromium*

Plaintiffs assert that Harvard's wastewater frequently contains detectable amounts of hexavalent chromium although Harvard repeatedly has failed to report these amounts. Plaintiffs' Brief at 13–14. Plaintiffs allege that two violations of the hexavalent chromium limitation occurred in 1989. 1/17/90 Bell Affidavit, Table I. In response, Harvard notes that its Joint Meeting discharge permit does not require monitoring for hexavalent chromium. Also, Harvard asserts that the alleged violations of the hexavalent chromium limitation are invalid because they are based on main sewer samples.

### DISCUSSION

## I. SUMMARY JUDGMENT

### A. *Regulatory Scheme*

Under section 307(b)(1), 33 U.S.C. § 1317(b)(1), of the Clean Water Act, the Administrator of the Environmental Protection Agency ("Administrator") is required to publish "regulations establishing pretreatment standards for introduction of pollutants into [POTWs] ... for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the

operation of such treatment works." The purpose of these pretreatment standards is to "prevent the discharge of any pollutant through [POTWs] ... which pollutant interferes with, passes through, or otherwise is incompatible with such works." *Id.*

Accordingly, the Administrator has promulgated two types of national pretreatment standards that are applicable to indirect discharges. 40 C.F.R. §§ 403.5, 403.6. First, under 40 C.F.R. § 403.5, the Administrator has promulgated the prohibited discharges standard which establishes "a general prohibition [*i.e.,* nonnumerical limit] on the release of any pollutants by any nondomestic source if those pollutants interfere with or pass through a POTW." *National Ass'n of Metal Finishers v. Environmental Protection Agency,* 719 F.2d 624, 634 (3d Cir.1983), *rev'd on other grounds, Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). This standard "serves as a back-up standard to address localized problems that occur." 52 Fed.Reg. 1586 (1987); 40 C.F.R. § 403.5(a). This standard also "establishes specific prohibitions which apply to all nondomestic users and are designed to guard against common types of pollutant discharges that may result in interference and pass through (*e.g.,* no discharge of flammable, explosive, or corrosive pollutants)." 52 Fed.Reg. at 1586; 40 C.F.R. § 403.5(b). Second, under 40 C.F.R. § 403.6, the Administrator has promulgated national categorical standards. These standards apply to specific categories of industrial users and "establish numerical, technology-based discharge limits derived from an assessment of the types and amounts of pollutants [sic] discharges that typically interfere with or pass through POTWs with secondary treatment facilities." 52 Fed. Reg. at 1586. Under 40 C.F.R. § 433.15, the Administrator has promulgated categorical pretreatment standards for metal finishers such as Harvard.

It is unlawful for an indirect discharger to operate in violation of any "effluent standard or prohibition or pretreatment standard" promulgated under section 307. 33 U.S.C. § 1317(d); 33 U.S.C. § 1311(a)

("Except in accordance with this section and section[ ] ... 1317 ... the discharge of any pollutant by any person shall be unlawful"). 40 C.F.R. § 403.5(d) provides that "[w]here specific prohibitions or limits on pollutants or pollutant parameters are developed by a POTW in accordance with ... [40 C.F.R. § 403.5(c)], such limits shall be deemed Pretreatment Standards for the purposes of section 307(d) of the Act." Where there are national categorical standards and local limitations for the same pollutants, the more stringent restrictions apply. 40 C.F.R. § 403.4 ("Nothing in this regulation is intended to affect any Pretreatment Requirements, including any standards or prohibitions, established by State or local law as long as the State or local requirements are not less stringent than any set forth in National Pretreatment Standards....").

### B. *Monitoring and Reporting Requirements*

Indirect dischargers must monitor and report the concentration of each discharged, regulated pollutant. 40 C.F.R. § 403.12(e)(1). All monitoring results, including results based on more frequent monitoring than required by either federal or local regulations, must be reported. 40 C.F.R. § 403.12(g)(5).

■ As only more stringent local monitoring and reporting requirements replace federal requirements, a POTW does not waive federal requirements by failing to include them in an indirect discharger's permit. A POTW, however, can waive its own requirements. For example, a POTW may waive its own monitoring requirements by failing to include them in an indirect discharger's permit. In the case at bar, the permit specifically lists certain pollutants which must be monitored, but this list does not include hexavalent chromium. Therefore, the Joint Meeting impliedly waived the monitoring requirement for this pollutant.

■ An indirect discharger, however, must report any monitoring results even if the monitoring was not required by either

federal or local regulations. Under 40 C.F.R. § 403.12(g)(5), if an industrial user such as Harvard which is subject to the reporting requirements in 40 C.F.R. § 403.12(e) "monitors *any* pollutant more frequently than required by the Control Authority ... the results of this monitoring shall be included in the [periodic compliance] report." 40 C.F.R. § 403.12(e) (emphasis added). There is no basis for restricting this reporting requirement to only federally regulated pollutants.

■ In addition, the Joint Meeting rules and regulations provide that industrial dischargers "[a]s a pre-condition for the right to discharge waste ... [must] provide information ... as needed[ ] to determine compliance with the[ ] rules and regulations." Plaintiffs' Brief, Exhibit 1, Article VI. As the principal mechanism for implementing the Clean Water Act is self-monitoring and self-reporting, the presence of any regulated pollutant must be reported regardless of whether the permit required monitoring. For example, presumably ESNA's permit does not require monitoring for hexavalent chromium because the Joint Meeting did not expect this pollutant to be present in ESNA's wastewater.

Upon becoming aware of a violation, an indirect discharger must notify the POTW within 24 hours and must repeat sampling within 30 days. 40 C.F.R. § 403.12(g)(2). Within five days of the occurrence of any violation, the discharger must submit a report detailing the cause of the violation and any action taken to prevent future violations. Plaintiffs' Brief, Exhibit 1, Article XIII. Also, dischargers must "promptly notify the POTW in advance of any substantial change in the volume or character of pollutants in their discharge." 40 C.F.R. § 403.12(j).

## C. *Causation Defense*

District courts lack jurisdiction to review the validity of pretreatment standards promulgated under section 307 of the Act, 33 U.S.C. § 1317. These standards are reviewable by federal circuit courts. 33 U.S.C. § 1369(b). Section 505(a) of the Act, 33 U.S.C. 1365(a), vests federal district courts with jurisdiction to enforce the pretreatment standards. Thus, my authority is limited to determining whether Harvard is liable for civil penalties for violating applicable pretreatment standards.

Harvard urges that the categorical pretreatment standards are not strictly enforceable. Harvard's Surreply at 4. Relying on *Metal Finishers*, Harvard asserts that "causation and proof that the contamination actually reached, passed through and interfered with the POTW operation is essential to establish *liability* for violation of *33 U.S.C. Sec. 1317(b)(1)*." Harvard's Response at 13–14 (emphasis in original). Thus Harvard argues that as an indirect discharger it is not liable for any Clean Water Act violations because plaintiffs cannot demonstrate that ESNA wastewater caused the Joint Meeting POTW to violate its National Pollutant Discharge Elimination System ("NPDES") permit. *Id.* at 22.

*Metal Finishers* is inapposite here.[8] Although the *Metal Finishers* court invalidated a then existing regulatory definition of interference because "neither the language of the Act nor the intent of Congress appears to contemplate liability without causation," 719 F.2d at 640, the court's holding is limited to the prohibited discharges standard.[9] For example, while the court stated

---

**8.** In denying Harvard's earlier Rule 12(b)(6) motion, Judge Politan stated that *Metal Finishers* "does not require an allegation of causation to sustain a complaint that alleges a violation of the categorical pretreatment standards promulgated by E.P.A. pursuant to the authority vested in the agency under the Clean Water Act, 33 U.S.C. § 1251, *et seq.* [*Metal Finishers,* 719 F.2d] at 656, n. 50; *United States v. Parker Metal Corp.,* 25 Env't Rep.Cas. 1578, 1986 WL 15619 (D.Mass.1986)." *International Union v. Harvard,* No. 86–1833, letter opinion and order at 2 (D.N.J. Jan. 13, 1989).

**9.** Prior to *Metal Finishers,* interference was "an inhibition or disruption of the POTW ... which is a cause of or significantly contributes to either a violation of any requirement of the POTW's NPDES permit or to the prevention of sludge use or disposal by the POTW." 40 C.F.R. § 403.3(j) (1982). The *Metal Finishers* court did not review the definition of "pass through" because EPA conceded that it was promulgated in violation of the Administrative Procedure Act. However, the court noted that the definition of pass through "was 'almost identical' to the

that the categorical pretreatment standards "establish numerical limits on the discharge ... of particular toxic pollutants which *could* cause interference or pass through," *id.* at 634 (emphasis added), it did not indicate that these standards are unenforceable without direct proof of causation. Rather, the court noted that the definitions of interference and pass through "play no part in either the setting or administration of the categorical pretreatment standards. We can therefore see no reason why their invalidity should affect the validity of the ... [categorical] standards." 719 F.2d at 656 n. 50; *see also Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 790 F.2d 289, 293 (3d Cir.1986), *cert. denied, Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987) (the court stated that indirect dischargers must conform to national pretreatment standards "in treating waste before such waste reaches the POTW").

In *Metal Finishers* the court noted that under the then existing definition of interference industrial users could be held liable for violating the Act although their discharges were not even potentially incompatible. The court explained that "[i]f the inhibition or disruption is caused not by the industrial user's discharge but by a mistake or malfunction at the POTW, the industrial user will be punished for the POTW's impaired treatment." 719 F.2d at 640–41. The court therefore concluded that "given the language and purpose of the Act, an indirect discharge [sic] cannot be liable under *the prohibited discharge standard* unless it is a cause of the POTW's permit violation or sludge problem." *Id.* at 641 (emphasis added). Nothing in *Metal Finishers* indicates that liability for violating categorical standards also must be based on direct evidence that particular discharges actually caused interference or pass through.

Rather, the categorical pretreatment standards implicitly incorporate a causation element. As numerical limitations, the categorical standards reflect explicit determinations that the discharge of certain concentrations of pollutants will cause interference or pass through. The categorical standards are intended to ensure attainment of "the parity in removals between direct and indirect dischargers that is mandated by the statute." *Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 790 F.2d 289, 303 (3d Cir.1986). "[A]ccording to the language of § 307(b)(1), pollutants from a particular industrial category are deemed to be passing through the POTW in unacceptable amounts where the POTW effluent violates the limit for that pollutant which a direct discharger in that industrial category would be required to meet." 46 F.R. at 9407 (1981).

In determining the categorical pretreatment standards, EPA compared the percentage of each regulated pollutant that a POTW can remove from the wastestream with the percentage that a direct discharger using the best available technology can remove.[10] *Id.* at 9407, 9415. Where POTWs were found to be less efficient than direct dischargers at removing a regulated pollutant, EPA calculated the maximum concentration of that pollutant (*i.e.,* the categorical standard) that can be present in an indirect discharger's wastewater without preventing attainment of the mandated parity in removals. If indirect

---

promulgated definition of interference." 719 F.2d 624, 641 (quoting 46 Fed.Reg. 9416 (1981)).

10. EPA has explained that
  data on the removal efficiency of POTWs compared to the removal efficiency of direct dischargers at BAT [*i.e.,* best available technology] supports EPA's view that toxic pollutants from Industrial Users are passing through POTWs into the navigable waters and, therefore, are appropriate candidates for control under pretreatment regulations.

  ... [R]ather than compare the mass or the concentration of pollutants discharged by the POTW with the mass or the concentration of a BAT direct discharger, EPA has concluded that comparison of the percent of the pollutant removed by the POTW with the percent removed by a BAT direct discharger provides a real-world means of comparison of treatment capabilities.
46 F.R. at 9407 (1981).

dischargers believe that federal or local categorical standards either in general or as applied to themselves individually are inaccurate, their recourse is to petition EPA and/or the POTW to revise the standards or to issue removal credits.

■ As the categorical standards implicitly incorporate a causation element, it is unnecessary to demonstrate an NPDES permit violation to assure that industrial users are held liable only for incompatible discharges. If violations of categorical and local standards were not actionable without direct proof of NPDES permit violations, these standards would be covered by the prohibited discharges standard and thus superfluous.

■ Although the Joint Meeting's additional numerical limitations were adopted under 40 C.F.R. § 403.5(c) (*i.e.*, the prohibited discharges section), these limitations are completely analogous to the national categorical standards. The Joint Meeting's limitations also reflect specific determinations that the discharge of greater concentrations of the regulated pollutants will cause interference and/or pass through. Thus, for the same reasons that the national categorical pretreatment standards are enforceable without direct evidence that a particular discharge actually caused interference or pass through, the Joint Meeting's additional numerical limitations are enforceable without proof of NPDES permit violations.

### D. *Other Defenses*

■ Harvard asserts that 33 U.S.C. § 1319(f), governing actions initiated by the Administrator, is the exclusive basis for suing indirect dischargers. Accordingly, Harvard asserts that the court lacks subject matter jurisdiction over plaintiffs' claims. However, plaintiffs properly initiated this action under 33 U.S.C. § 1365, the citizen suit provision, which, as noted above, grants jurisdiction to the district courts to enforce Clean Water Act standards. Thus, the requirements of 33 U.S.C. § 1319(f) are completely irrelevant in the action at bar.

■ Harvard argues that the local limit compliance and unchanged discharge defenses promulgated under 40 C.F.R. § 403.5(a)(2) are applicable here. These affirmative defenses, however, are only available in actions "alleging a violation of the general prohibitions established in ... [40 C.F.R. § 403.5](a)(1) ... and the specific prohibitions in ... [40 C.F.R. § 403.5](b)(3), (4) and (5) ...." 40 C.F.R. § 403.5(a)(2). Therefore, these affirmative defenses are completely inapplicable in the case at bar as plaintiffs have alleged violations of national and local categorical standards (*i.e.*, violations of 40 C.F.R. §§ 403.6 and 403.-5(c), respectively).

Harvard notes that 33 U.S.C. § 1317(b)(1) permits a POTW to revise pretreatment requirements to reflect the POTW's removal of regulated pollutants. However, any defense based on this provision is totally inapplicable here. The Joint Meeting never revised any limitation to which Harvard is subject based on the POTW's removal of regulated pollutants.

■ The upset defense also is not available to Harvard. An upset is "an exceptional incident in which there is unintentional and temporary noncompliance with categorical Pretreatment Standards because of factors beyond the reasonable control of the Industrial User. An Upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, lack of preventive maintenance, or careless or improper operation." 40 C.F.R. § 403.16(a). This defense is available only if the POTW was timely and properly notified of the upset. 40 C.F.R. § 403.16(a)(2), (3). Moreover, "[i]n any enforcement proceeding the Industrial User seeking to establish the occurrence of an Upset shall have the burden of proof." 40 C.F.R. § 403.16(d). Harvard has demonstrated neither an upset nor that it fulfilled the conditions precedent to asserting an upset defense.

Harvard concedes the occurrence of 36 daily violations between July 18, 1987 and October 10, 1989, but fails to identify which violations are subject to the upset defense. Even if Harvard asserts this defense only

with respect to those violations which it alleges were caused by mechanical problems, Harvard completely fails to demonstrate that the defense is available. For example, Harvard does not allege that it notified the Joint Meeting within twenty-four hours of becoming aware of any upset. 40 C.F.R. § 403.16(c)(3). In fact, with respect to the January 1989 violations, on March 23, 1989 Harvard informed the Joint Meeting that these violations were caused by a mechanical problem, but also stated that it was aware of them when they occurred. Harvard's Response, Exhibit J.

▮ Finally, contrary to Harvard's assertions, the Clean Water Act recognizes neither a good faith nor a de minimis defense. As noted by the Tenth Circuit in *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979), "the regulatory provisions of the FWPCA [*i.e.*, the Act] were written without regard to intentionality ... making the person responsible for the discharge of any pollutant strictly liable." Several other courts have held that intent and good faith are irrelevant in actions involving liability for committing NPDES permit violations. *Pennsylvania Environmental Defense Foundation v. Mazurkiewicz*, 712 F.Supp. 1184, 1192 (M.D.Pa.1989); *Student Public Interest Research Group, Inc. v. AT & T Bell Laboratories*, 617 F.Supp. 1190 (D.N.J.1985); *Student Public Interest Research Group v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1400 (D.N.J.1984); *Student Public Interest Research Group, Inc. v. Monsanto Co.*, 600 F.Supp. 1479, 1785 (D.N.J.1985). Analogously, intent and good faith are irrelevant in actions involving the liability of indirect dischargers for committing violations of local and national pretreatment standards.

For the same reasons that intent and good faith are not a defense, there is no de minimis defense.[11] *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1491 (9th Cir.1987), *vacated, Union Oil Co. v. Sierra Club*, 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988) (the court held that the "Act and the regulations promulgated under it make no provision for 'rare' violations"); *Orgulf Transport Co. v. United States*, 711 F.Supp. 344, 350 (W.D.Ky.1989); *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.*, 692 F.Supp. 801, 815 (N.D.Ill.1988); *AT & T Bell Laboratories*, 617 F.Supp. at 1206 (the court declined to apply the de minimis doctrine because "[t]o do so would be inconsistent with the evident intent of Congress to penalize 'any' discharge of pollutants in violation of permit limitations. 33 U.S.C. §§ 1311(a), 1319(d)").

### E. *Violations*

Summary judgment must be granted where the moving party establishes that "there is no genuine issue as to any material fact and that ... [it] is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Once the moving party has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *rev'g* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *First Nat. Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir. 1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The Supreme Court has explained that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. A disputed factual matter is

---

11. Harvard relies on *Arkansas Poultry Federation v. United States Environmental Protection Agency*, 852 F.2d 324, 329 (8th Cir.1988). However, *Arkansas Poultry* is inapposite here because it involved liability for violations of the prohibited discharges standard and not the categorical pretreatment standards.

a "genuine" issue if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). All evidence must be viewed in a light most favorable to the nonmoving party. *Wahl v. Rexnord, Inc.*, 624 F.2d 1169, 1181 (3d Cir. 1980).

Harvard asserts that only samples taken at the Joint Meeting manhole are appropriate for determining compliance because (1) "this is the only sample point the regulatory authority will accept for determining permit compliance;" (2) upstream samples are not representative of the combined wastestream; (3) upstream samples are grab samples; and (4) sometimes upstream samples are drawn when the system is recycling. 12/5/89 Von Linden Affidavit, ¶ 3(B)(iii); 2/9/90 Von Linden Affidavit, ¶¶ 5–9.

■ Although since August 1988 the permit has required that Harvard monitor its wastewater at the Joint Meeting manhole, properly taken and analyzed upstream samples are samples taken "more frequently than required" and must be reported under 40 C.F.R. § 403.12(g).[12] EPA recognizes the validity of samples taken at either the Joint Meeting manhole or the main sewer.

Where a treated regulated process wastestream is combined prior to treatment with wastewaters other than those generated by the regulated process, the Industrial User may monitor either the segregated process wastestream or the combined wastestream for the purpose of determining compliance with applicable Pretreatment Standards. If the Industrial User chooses to monitor the segregated process wastestream, it shall apply the applicable categorical Pretreatment Standard. If the User chooses to moni-

tor the combined wastestream, it shall apply an alternative discharge limit calculated using the combined wastestream formula as provided in this section.

40 C.F.R. § 403.6(e)(4). Thus, Harvard's assertion that upstream samples were taken only for internal monitoring purposes is irrelevant. For Joint Meeting manhole samples, compliance is determined by comparing sample analysis results with categorical pretreatment standards that are adjusted by the combined wastestream formula. For main sewer samples, compliance is determined by comparing sample analysis results with unadjusted categorical pretreatment standards.

■ Although Harvard asserts that some main sewer samples were taken when the system was recycling, this bare allegation fails to raise a genuine issue of material fact. Harvard neither identifies when the system was recycling nor asserts that it can provide such information and thus fails to demonstrate more than a metaphysical doubt as to the representativeness of any particular sample.

Summary judgment must be granted for each daily violation which is conceded by Harvard or for which Harvard provides no explanation or evidence casting doubt on the validity of the underlying sample analysis result.[13] For example, assuming, as Harvard asserts, that main sewer samples are grab samples, Harvard fails to explain why they are invalid for determining compliance with cyanide and pH limitations. As previously explained, grab samples are used to test for cyanides and pH, but not for metals. Therefore, summary judgment against Harvard is appropriate for all main sewer samples which indicate either cyanide or pH violations. Also, Harvard is liable for falsely submitting 4 main sewer samples on March 23, 1989 to demonstrate

---

**12.** Although the Joint Meeting takes samples at the Joint Meeting manhole, this does not establish that upstream samples cannot demonstrate violations. Prior to August 1988, almost all samples were taken upstream from the Joint Meeting manhole.

**13.** Harvard contests certain alleged violations which are based on samples that were split at

the sampling site (*i.e.*, "split samples") and analyzed by both the Joint Meeting's laboratory and Harvard's laboratory. Where a split sample was analyzed by both laboratories and the sample analysis report of either laboratory shows no violation, there is an issue of fact, and summary judgment must be denied. There were 2 such situations.

compliance with both the cyanide and cadmium limitations. Finally, summary judgment must be granted against Harvard for each valid daily measurement which it failed to report. Summary judgment for these omissions is appropriate regardless of whether the unreported measurements indicate violations.

Summary judgment cannot be granted for all other alleged daily violations: alleged violations for which there are no supporting laboratory reports; alleged violations of standards for metals that are based on main sewer samples; and alleged violations based on split samples where the sample analysis results of either Harvard's laboratory or the Joint Meeting's laboratory indicate that there is no violation.

Table II to this opinion sets forth the alleged daily violations for which summary judgment is granted. This includes those violations which Harvard conceded in Von Linden's December 5, 1989 affidavit ("Conceded"). This includes violations shown on laboratory reports as to which Harvard offered no challenge ("Not Contested"). This also includes (over Harvard's unfounded objections) violations based on grab samples taken at the main sewer for the standards for total cyanides, amenable cyanides and pH ("MS Sample").[14]

Table III to this opinion sets forth the alleged daily violations for which summary judgment is denied. This includes alleged violations for which there are no laboratory reports ("No Documentation"). This includes alleged violations of standards for metals which are based on grab samples ("MS Sample"). This also includes alleged violations based on split samples where the results of Harvard's laboratory and the Joint Meeting's laboratory are in conflict as to whether there is a violation ("Split Sample").

Since the permit was issued, Harvard has been required to calculate and report monthly averages for almost every regulated pollutant. Even though the permit itself did not require such reporting until August 1988, as noted above, the requirement was imposed by EPA regulations and also by the general rules and regulations of the Joint Meeting. Also as noted above, even if the initial absence of the monthly reporting requirement constituted a waiver of that requirement by the Joint Meeting, the EPA regulations would still control. Thus, as Harvard has reported monthly averages only since August 1988, summary judgment can be entered against Harvard for failing prior to that date to report monthly averages in each required periodic compliance report.

■ As noted above, the monthly average of a pollutant is the average of all daily samples taken in a calendar month. There is a monthly average maximum for almost every pollutant. It is obvious that for some months, based on the laboratory analysis reports as to which I find no dispute, Harvard was in violation of monthly average limitations and summary judgment might be entered with respect to those pollutants and months. As to those months, Harvard would be deemed to have committed 30 violations.[15] However, in many months the validity of the laboratory results is reasonably disputed for the reasons referred to above. As to those months, summary judgment probably could not be entered. Thus, the computation of each monthly average would involve complexities which preclude summary judgment at this time. If necessary, I may in the future require the parties to make these computations based on the record and my rulings as set forth in this opinion.

## II.  PRELIMINARY INJUNCTION

Plaintiffs seek an order directing Harvard to sample its wastewater on a weekly basis; to analyze samples for hexavalent chromium; to promptly report violations;

---

**14.** "MS Samples" include samples taken at the main sewer, the DMP system and the plating department sites. As noted above, samples taken at the DMP system site and at the plating department site can been treated as having been taken at the main sewer.

**15.** At this time, I need not decide if this would constitute the totality of violations for the month or whether the daily violations for the month would also be counted as violations.

and to comply with all applicable daily and monthly discharge limitations.

Injunctive relief cannot automatically be granted upon a finding of statutory violation. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934 (3d Cir.1990). In *Texaco Refining,* the Third Circuit recently held that irreparable injury cannot be presumed from the mere fact that the Clean Water Act has been violated. The court expressly stated that the traditional equitable standards must be applied in determining whether to grant injunctive relief under the Act. Thus, a preliminary injunction is appropriate in the case at bar only if plaintiffs have demonstrated (1) probability of success on the merits; (2) that plaintiffs will be irreparably injured if the injunction is denied; (3) that granting the injunction will not result in even greater harm to Harvard; and (4) that granting the injunction is in the public interest. *See ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985).

Plaintiffs have demonstrated not only likely but actual success on the merits. In fact, as noted in Table II to this opinion, summary judgment must be granted for numerous daily discharge violations and for many valid monitoring results, including numerous and substantial violations, which Harvard failed to report.

Irreparable injury will result if the injunction is not granted. In *Romero–Barcelo,* 456 U.S. at 314–15, 102 S.Ct. at 1804–05, and *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Court held that injunctive relief is inappropriate to prevent violations of merely procedural or technical requirements. *See Texaco Refining,* 906 F.2d at 937–939. In the action at bar, however, plaintiffs seek a preliminary injunction to prevent ongoing violations of applicable federal and local discharge standards. As these standards are at the heart of the Clean Water Act, Harvard's violations directly and critically upset the Act's objective: *i.e.,* "to restore and maintain the integrity of the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a). Thus, unlike both *Romero–Barcelo* and *Amoco,* the action at bar is not focused on technical or procedural matters, such as the failure to a apply for an NPDES permit (as in *Romero–Barcelo* ) or the failure to thoroughly evaluate the environmental impact of a proposed action (as in *Amoco* ). Likewise, the action at bar is distinguishable from *Texaco Refining* where the "district court—especially in light of its finding that no violation of the new permit has occurred—appears to have erroneously presumed irreparable harm from the mere fact of statutory violation, thus improperly focusing on the integrity of the permit process rather than the integrity of the Nation's waters." *Texaco Refining,* 906 F.2d at 941. In *Amoco,* the Court stated that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is *sufficiently likely,* therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." 480 U.S. at 545, 107 S.Ct. at 1404 (emphasis added).

Congress impliedly has determined that violations of the categorical pretreatment standards are sufficiently likely to cause irreparable injury. In order to protect the integrity of the nation's waters, the Act is designed to bring about the elimination of all polluting discharges. *See Public Interest Research Group of N.J., Inc. v. CP Chemicals, Inc.,* 26 E.R.C. 2017, 2021 (D.N.J.1987) (the court stated that the "1972 amendments to the Act were intended to effect a significant shift in the focus of water pollution control away from an analysis of the receiving waters to a system of gradual decreases until technological advances justified an eventual goal of zero discharges"). The Act specifically provides that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1). The Act further provides that "it is the national policy that the

discharge of toxic pollutants in toxic amounts be prohibited." 33 U.S.C. § 1251(a)(3).

The discharge standards promulgated by EPA and the Joint Meeting and applicable to Harvard incorporate the Act's goals. All of the metals and cyanides which are subject to the preliminary injunction are listed by EPA as toxic pollutants in accordance with section 307(a)(1) of the Act, 33 U.S.C. § 1317(a)(1). 40 C.F.R. § 401.15. Also, pH is listed by EPA as a conventional pollutant in accordance with section 304(a)(4) of the Act, 33 U.S.C. § 1314(a)(4). 40 C.F.R. § 401.16. Thus, Harvard's ongoing violations constitute irreparable injury because they are directly contrary to Congress' determination that the underlying discharges should be eliminated altogether. Accordingly, there is no weight to Harvard's assertion that its violations do not constitute irreparable injury because they have had no impact on either the POTW or the Arthur Kill Waterway because after dilution with the POTW's combined influents "the level of contamination would be very low." 12/8/89 Appelbaum Affidavit, ¶¶ 5-6.

In addition, accepting Harvard's argument could lead to an absurd result. If all dischargers argued that their illegal discharges, by themselves, were too minimal to constitute irreparable injury, even though the totality of the discharges caused substantial irreparable harm plaintiffs could not remedy the situation by seeking injunctive relief. Such relief, however, is specifically available under section 505 of the Act, 33 U.S.C. § 1365. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 53, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987) (the Court held that if the citizen prevails in a civil action brought under 33 U.S.C. § 1365(a)(1) "the court may order injunctive relief and/or impose civil penalties. . . .").

Finally, plaintiffs will be irreparably injured if the preliminary injunction is denied because Harvard's violations of federal requirements and its permit are ongoing. Contrary to Harvard's assertion, Harvard's record fails even to "show[ ] continued attempts at compliance." 12/5/89 Von Linden Affidavit, ¶ 3(C)(viii). As noted in Table II to this opinion, since this action was initiated on May 12, 1986, Harvard has committed 90 daily discharge violations alone for which summary judgment must be granted. Harvard wrongly asserts that since June 1988 it has been in continued compliance. In fact, since June 1988 Harvard has committed 39 daily discharge violations for which summary judgment must be granted. Harvard even committed 11 daily discharge violations for which summary judgment must be granted in the first three months after the pending motions were filed. Thus, absent an injunction it is exceedingly likely that Harvard will continue to violate applicable Clean Water Act standards and thus cause plaintiffs and the public further irreparable harm.

Although summary judgment cannot be granted for Harvard's alleged violations of the hexavalent chromium standard, plaintiffs' request for a preliminary injunction requiring Harvard to analyze samples for the presence of this toxic pollutant also must be granted. Based on the sample analysis reports of Harvard's laboratory, there is substantial evidence indicating that this metal might be present in Harvard's wastewater in significant concentrations, and therefore further sampling and analysis are warranted.

Also, the third factor (*i.e.,* injury to the nonmoving party) which must be considered totally supports issuance of the injunction. As .plaintiffs are not requesting that Harvard discontinue discharging its wastewater to the POTW, Harvard will suffer only minimal, if any, economic injury (*i.e.,* the cost of additional monitoring) by issuance of the injunction. In fact, Harvard fails even to assert that this is a basis for denying the preliminary injunction. Harvard's discharges were monitored for the regulated pollutants, including hexavalent chromium, on a weekly basis at least until November 1989 (after the pending motions were filed). Thus, under no circumstances will requiring the requested monitoring appreciably harm Harvard. Also, Harvard is already statutorily re-

quired to promptly report violations and to comply with all applicable discharge standards. Therefore, granting a preliminary injunction incorporating these requirements will not harm Harvard in the least, but will avail plaintiffs of the opportunity to initiate contempt proceedings against Harvard if it continues to violate the Act.

Finally, as the public is profoundly interested in enforcing standards promulgated under the Clean Water Act, granting the preliminary injunction is absolutely in the public interest.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted in part and denied in part, and the preliminary injunction is granted. Accordingly, Harvard's cross-motion for summary judgment seeking dismissal of the second amended complaint and litigation costs is denied.

Plaintiffs are requested to submit an appropriate form of order within seven days of receiving this opinion.

## TABLE I [1]

### LIMITATIONS [2]

| Parameter | 2/15/86–5/7/86[3] 1–Day Max. | Mo.Avg. Max. | 5/8/86–7/20/86[4] 1–Day Max. | Mo.Avg. Max. | 7/21/86–1/31/87 1–Day Max. | Mo.Avg. Max. | 2/1/87–8/14/88 1–Day Max. | Mo.Avg. Max. | 8/15/88–1/31/90[5] 1–Day Max. | Mo.Avg. Max. |
|---|---|---|---|---|---|---|---|---|---|---|
| pH | 6–9 | —— | 6–9 | —— | 6–9 | —— | 6–9 | —— | 6–9 | —— |
| Cadmium(T) | 0.4 | 0.20 | 0.4 | 0.20 | 0.4 | 0.17* | 0.4 | 0.17* | 0.4 | 0.19* |
| Chromium(T) | 2.77 | 1.0 | 2.77 | 1.0 | 1.83* | 1.0 | 1.83* | 1.13* | 2.03* | 1.25* |
| Copper(T) | 1.0 | 0.5 | 1.0 | 0.5 | 1.0 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 |
| Nickel(T) | 2.0 | 1.0 | 2.0 | 1.0 | 2.0 | 1.0 | 2.0 | 1.57* | 2.0 | 1.74* |
| Lead(T) | 0.69 | 0.43 | 0.69 | 0.43 | 0.46* | 0.28* | 0.46* | 0.28* | 0.51* | 0.31* |
| Zinc(T) | 2.61 | 1.43 | 2.61 | 1.48 | 1.72* | 0.98* | 1.72* | 0.98* | 1.91* | 1.08* |
| Silver(T) | 0.43 | 0.24 | 0.43 | 0.24 | 0.28* | 0.16* | 0.28* | 0.16* | 0.31* | 0.18* |
| Cyanide(T) | 1.2 | 0.65 | 0.96* | 0.52* | 0.24* | 0.13* | 0.24* | 0.13* | 0.40* | 0.22* |
| Cyanide(A) | 0.86 | 0.32 | 0.69* | 0.26* | 0.17* | 0.17* | 0.17* | 0 06* | 0.29* | 0.11* |
| TTO | 2.13 | —— | 2.13 | —— | 1.40* | —— | 1.40* | —— | 1.56* | —— |
| Hexavalent Chromium | 0.25 | 0.09 | 0.25 | 0.09 | 0.25 | 0.09 | 0.25 | —— | 0.25 | —— |

--------------------------

\* These limits are adjusted by the combined wastestream formula.

1. All measurements except for pH are in milligrams per liter. Measurements for pH are in standard units.

2. There are federal, Joint Meeting and permit limitations. The lowest limitation is controlling. However, if a limitation specified in the Joint Meeting rules and regulations is lower than a permit limitation, the latter is controlling. If there is no permit or federal limitation for a particular pollutant, but a limitation is contained in the rules and regulations then that limitation is controlling for reporting purposes. Although Harvard is not required to monitor for that pollutant, Harvard must still report all valid monitoring results.

3. Harvard became subject to the metal finishing categorical pretreatment standards on February 15, 1986. 40 C.F.R. § 433.17(f). Prior to that date, Harvard was subject to the electroplating categorical pretreatment standards. 40 C.F.R. § 413.01.

4. Although both the first and second permit revisions state that they became effective on April 15, 1986, Harvard became accountable under these revisions only upon receiving notice (i.e., May 8, 1986 and July 21, 1986, respectively).

5. January 31, 1990 is the last day of an alleged violation.

## TABLE II [1]

### ALLEGED DAILY VIOLATIONS—SUMMARY JUDGMENT GRANTED

| Date | Lab | Sample ID | Para-meter | Limit | Amount | Comment |
|---|---|---|---|---|---|---|
| 1/7/86 | Chyun [2] | 260–8 | Pb | 0.6(a) | 2.1 | Not Contested |
| 3/26/86 | Chyun | 260–18 | CN–T | 0.24(b) | 2.7 | Not Contested |
| 3/26/86 | Chyun | 260–18 | Cd | 0.4 | 0.95 | Not Contested |
| 4/3/86 | Chyun | 260–20 | Pb | 0.46(b) | 1.40 | Not Contested |

| Date | Lab | Sample ID | Parameter | Limit | Amount | Comment |
|------|-----|-----------|-----------|-------|--------|---------|
| 4/8/86 | Chyun | 260–21 | CN–T | 0.24(b) | 15.0 | Not Contested |
| 4/8/86 | Chyun | 260–21 | Cd | 0.4 | 2.1 | Not Contested |
| 4/28/86 | JM [3] | — | CN–T | 1.2 | 1.92 | Not Contested |
| 4/28/86 | JM | — | CN–A | 0.86 | 1.92 | Not Contested |
| 4/28–29/86 | JM | — | Cd | 0.4 | 1.18 | Not Contested |
| 4/28–29/86 | JM | — | Ni | 2.0 | 2.14 | Not Contested |
| 4/29–30/86 | JM | — | Cd | 0.4 | 0.44 | Not Contested |
| 6/5/86 | ATL [4] | 031 | CN–T | 0.96 | 3.2 | Not Contested(c) |
| 6/5/86 | ATL | 032 | Cd | 0.4 | 0.42 | Not Contested(d) |
| 8/20/86 | JM | 2943 | CN–A | 0.17 | 0.19 | Conceded(e) |
| 8/20–21/86 | JM | — | Cd | 0.4 | 1.90 | Conceded |
| 8/20–21/86 | JM | — | Cu | 1.0 | 2.50 | Not Contested |
| 8/21/86 | JM | 2947 | CN–T | 0.24 | 1.29 | Conceded |
| 8/21/86 | JM | 2947 | CN–A | 0.17 | 1.29 | Conceded |
| 9/29–30/86 | JM | — | Cd | 0.40 | 2.40 | Conceded |
| 10/23/86 | JM | 3081 | CN–T | 0.24 | 14.3 | Not Contested |
| 10/23/86 | JM | 3081 | CN–T | 0.17 | 14.3 | Not Contested |
| 10/23–24/86 | JM | — | Cd | 0.4 | 0.82 | Not Contested |
| 11/3/86 | JM | 3110 | CN–T | 0.24 | 1.58 | Conceded |
| 11/3/86 | JM | 3110 | CN–A | 0.17 | 1.58 | Conceded |
| 11/3–4/86 | JM | 3111 | Cd | 0.4 | 0.74 | Conceded |
| 11/4–5/86 | JM | 3113 | Cd | 0.4 | 0.82 | Conceded |
| 11/4–5/86 | JM | 3113 | Cu | 1.0 | 1.04 | Not Contested |
| 12/15/86 | Chyun | 260–33 | TTO | 1.40(b) | 1.72 | Not Contested |
| 3/5–6/87 | JM | — | Ag | 0.28 | 0.97 | Not Contested |
| 3/6/87 | JM | — | CN–T | 0.24 | 0.38 | Not Contested |
| 3/6/87 | JM | — | CN–A | 0.17 | 0.38 | Not Contested |
| 4/30/87 | Chyun | 260–39 | Cd | 0.4 | 1.2 | Not Contested |
| 5/12/87 | JM | 3446 | CN–T | 0.24 | 0.52 | Conceded |
| 5/12/87 | JM | 3446 | CN–A | 0.17 | 0.52 | Conceded |
| 9/9/87 | JM | 3676 | CN–T | 0.24 | 0.81 | Conceded |
| 9/9–10/87 | JM | — | Cd | 0.4 | 1.23 | Not Contested |
| 10/20/87 | JM | 3759 | CN–T | 0.24 | 0.31 | Conceded |
| 11/11/87 | Chyun | 260–54 | CN–T | 0.24 | 2.8 | Conceded |
| 11/11/87 | Chyun | 260–54 | CN–A | 0.17 | 0.94 | Conceded |
| 2/17/88 | JM | 3911 | CN–T | 0.24 | 2.05 | Conceded |
| 2/17/88 | JM | 3911 | CN–A | 0.17 | 1.92 | Conceded |
| 3/1/88 | ATL | 3467 | Cd | 0.4 | 0.93 | Not Contested(f) |
| 3/8/88 | ATL | 3553 | Cd | 0.4 | 0.96 | Not Contested(g) |
| 4/19/88 | JM | 4073 | CN–T | 0.24 | 1.07 | Conceded |
| 4/19/88 | JM | 4073 | CN–A | 0.17 | 0.252 | Conceded |
| 4/20/88 | JM | 4083 | CN–T | 0.24 | 0.860 | Conceded(h) |
| 4/21/88 | JM | 4090 | CN–T | 0.24 | 0.24 | Conceded(h) |
| 5/25/88 | ATL | 4044 | CN–T | 0.24 | 1.06 | Not Contested(i) |
| 5/25/88 | ATL | 4044 | CN–A | 0.17 | 0.47 | Not Contested(i) |
| 5/26/88 | JM | 4180 | CN–T | 0.24 | 0.89 | Conceded(h) |
| 5/26/88 | JM | 4180 | CN–A | 0.17 | 0.68 | Conceded(h) |
| 7/18/88 | JM | 4298 | CN–T | 0.24 | 0.35 | Conceded(h) |
| 7/18/88 | JM | 4298 | CN–A | 0.17 | 0.34 | Conceded(h) |
| 9/6/88 | ATL | 4541 | CN–T | 1.20 | 1.71 | MS Sample |
| 9/14/88 | ATL | 4592 | CN–T | 1.20 | 2.9 | MS Sample |
| 9/14/88 | ATL | 4592 | CN–A | 0.86 | 1.88 | MS Sample |
| 11/1/88 | ATL | 4742 | CN–T | 1.2 | 1.61 | MS Sample |
| 12/6/88 | ATL | 4986 | pH | 6–9 | 9.1 | MS Sample |
| 1/5/89 | ATL | 5180 | CN–T | 1.2 | 1.99 | MS Sample |
| 1/12/89 | ATL | 5225 | CN–T | 1.2 | 4.12 | MS Sample |
| 1/12/89 | ATL | 5255 | CN–A | 0.86 | 4.03 | MS Sample |
| 1/19/89 | JM | 4690 | CN–T | 0.4 | 2.56 | Conceded(h) |
| 1/19/89 | JM | 4690 | CN–A | 0.29 | 1.57 | Conceded(h) |
| 1/19–20/89 | JM | 4693 | Cd | 0.4 | 0.87 | Conceded(h) |

| Date | Lab | Sample ID | Para-meter | Limit | Amount | Comment |
|------|-----|-----------|-----------|-------|--------|---------|
| 1/30/89 | JM | 4914 | pH | 6–9 | 4 | Not Contested |
| 1/30/89 | JM | 4914 | CN–T | 0.4 | 1.06 | Conceded(h) |
| 1/30/89 | JM | 4914 | CN–A | 0.29 | 1.05 | Conceded(h) |
| 1/31/89 | JM | 4919 | CN–T | 0.4 | 1.07 | Conceded(h) |
| 1/31/89 | ATL | 5325 | CN–T | 1.2 | 15.51 | MS Sample(j) |
| 1/31/89 | ATL | 5325 | CN–A | 0.86 | 7.84 | MS Sample |
| 2/28/89 | ATL | 5536 | CN–T | 1.2 | 6.17 | MS Sample |
| 2/28/89 | ATL | 5536 | CN–A | 0.86 | 5.24 | MS Sample |
| 3/7/89 | ATL | 5595 | CN–T | 1.2 | 2.10 | MS Sample |
| 3/7/89 | ATL | 5595 | CN–A | 0.86 | 1.14 | MS Sample |
| 4/26/89 | ATL | 5996 | CN–T | 1.2 | 7.5 | MS Sample |
| 4/26/89 | ATL | 5996 | CN–A | 0.86 | 6.5 | MS Sample |
| 5/15/89 | JM | 4907 | pH | 6–9 | 2.75 | Not Contested |
| 5/23/89 | ATL | 6257 | CN–T | 0.40 | 0.48 | Conceded |
| 5/23/89 | ATL | 6257 | CN–A | 0.29 | 0.48 | Conceded |
| 11/21/89 | ATL | 8069 | CN–T | 0.4 | 0.54 | Not Contested |
| 11/21/89 | ATL | 8069 | CN–A | 0.29 | 0.46 | Not Contested |
| 11/22/89 | ATL | 8082 | CN–T | 0.4 | 1.03 | Not Contested |
| 12/13/89 | ATL | 8324 | CN–T | 1.2 | 2.01 | MS Sample |
| 12/13/89 | ATL | 8324 | CN–A | 0.86 | 1.54 | MS Sample |
| 1/4/90 | ATL | 8432 | CN–T | 1.2 | 1.91 | MS Sample |
| 1/4/90 | ATL | 8432 | CN–A | 0.86 | 1.12 | MS Sample |
| 1/9/90 | ATL | 8455 | CN–T | 1.2 | 3.81 | MS Sample |
| 1/9/90 | ATL | 8455 | CN–A | 0.86 | 2.38 | MS Sample |
| 1/17/90 | ATL | 8520 | CN–T | 1.20 | 4.5 | MS Sample |
| 1/17/90 | ATL | 8520 | CN–A | 0.86 | 1.65 | MS Sample |

NOTES: (a) The electroplating limitation is applicable because the sample was drawn before February 15, 1986.

(b) The adjusted (*i.e.*, combined wastestream formula) limitation is applicable because this sample was drawn from the Joint Meeting manhole.

(c) The sample analysis report does not indicate the sampling location or collection technique. Nonetheless, summary judgment is appropriate because the sample was taken when the permit provided for sampling at the main sewer; only total cyanide is reported on the sample analysis report; and Harvard has not contested plaintiffs' allegation that the sample analysis report indicates a violation.

(d) The sample analysis report does not indicate the sampling location or collection technique. Nonetheless, summary judgment is appropriate because the sample was taken when the permit provided for sampling at the main sewer; only metals are reported on the sample analysis report; and Harvard has not contested plaintiffs' allegation that the sample analysis report indicates a violation.

(e) As this violation is conceded by Harvard, I will grant summary judgment although no laboratory analysis report has been submitted.

(f) The sampling location of this composite sample is not identified on the ATL sample analysis report. Nonetheless, summary judgment is appropriate because the sample was taken when the permit provided for sampling at the Joint Meeting manhole, and Harvard has not contested plaintiffs' allegation that the sample analysis report indicates a violation.

(g) The sampling location and the collection technique are not identified on the ATL sample analysis report. However, summary judgment is appropriate because the sample was taken when the permit provided for sampling at the Joint Meeting manhole; only metals are reported on the sample analysis report; and Harvard has not contested plaintiffs'

allegation that the sample analysis report indicates a violation.

(h) This is a split sample, but both the Joint Meeting and Harvard sample analysis reports indicate a violation.

(i) The sampling location of this grab sample is not identified on the ATL sample analysis report. Nonetheless, summary judgment is appropriate because the sample was taken when the permit provided for sampling at the Joint Meeting manhole, and Harvard has not contested plaintiffs' allegation that the sample analysis report indicates a violation.

(j) Although a Joint Meeting sample taken on the same day also indicates a violation, as this is not a split sample but a separate grab sample it indicates a separate violation.

-----------------------------

1. All measurements except for pH are in milligrams per liter or parts per million. Measurements for pH are in standard units.

2. "Chyun" is Chyun Associates.

3. "JM" is Joint Meeting.

4. "ATL" is Analitical Testing Laboratory.

TABLE III [1]

**ALLEGED DAILY VIOLATIONS—SUMMARY JUDGMENT DENIED**

| Date | Lab | Sample ID | Parameter | Limit | Amount | Comment |
|------|-----|-----------|-----------|-------|--------|---------|
| 7/10–11/86 | JM [2] | —— | Cd | 0.4 | 0.42 | No Documentation |
| 7/11/86 | JM | —— | CN–A | 0.69 | 0.94 | No Documentation |
| 7/5/88 | ATL [3] | 4291 | Cd | 0.4 | 0.48 | MS Sample |
| 7/12/88 | ATL | 4309 | CN–T | 1.2 | 0.32 | MS Sample(a) |
| 1/31/89 | ATL | 5329 | CN–A | 0.29 | 0.31 | Split Sample(b) |
| 3/21/89 | ATL | 5701 | Cd | 0.4 | 3.04 | MS Sample |
| 7/6/89 | ATL | 6701 | Cd | 0.4 | 0.44 | MS Sample |
| 7/18/89 | ATL | 6821 | Cd | 0.4 | 0.43 | MS Sample |
| 7/18/89 | ATL | 6821 | Cr–6 | 0.25 | 0.41 | MS Sample |
| 7/19/89 | JM | 5027 | CN–A | 0.29 | 0.31 | Split Sample(b) |
| 8/8/89 | ATL | 7005 | Cr–6 | 0.25 | 1.04 | MS Sample |
| 10/3/89 | ATL | 7465 | Cd | 0.4 | 0.51 | MS Sample |
| 11/14/89 | ATL | 7971 | Cr–6 | 0.25 | 0.30 | MS Sample |
| 11/28/89 | ATL | 8093 | Cr–6 | 0.45 | 0.44 | MS Sample |
| 1/9/90 | ATL | 8455 | Cd | 0.4 | 0.45 | MS Sample |
| 1/31/90 | ATL | 8618 | Cr–6 | 0.25 | 0.67 | MS Sample |

NOTES: (a) The sample analysis report does not indicate the sampling location or collection technique. However, based on Harvard's assertions this is a main sewer grab sample.

(b) Either the Joint Meeting or the ATL sample analysis report does not indicate a violation.

----------------------

1. All measurements except for pH are in milligrams per liter or parts per million. Measurements for pH are in standard units.

2. "JM" is Joint Meeting.

3. "ATL" is Analytical Testing Laboratory.