**The CITY OF NEW YORK, Plaintiff,**

v.

**ANGLEBROOK LIMITED PARTNER-SHIP; Somers Golf Associates; Mitsui Fudosan (New York), Inc.; Kajima International, Inc.; Doe 1 and Doe 2, Defendants.**

No. 94 Civ. 7215 (BDP).

United States District Court,
S.D. New York.

April 14, 1995.

Philip M. Bein, Paul A. Crotty, Corp. Counsel of NYC, New York City, for The City of New York.

Henry Hocherman, Shamberg Marwell Cherneff, Hocherman Davis & Hollis, P.C., Mt. Kisco, NY, for Anglebrook Ltd. Partnership, Somers Golf Associates, Mitsui Fudosan (New York), Inc., Kajima Intern., Inc., Doe 1 and Doe 2.

Eugene Martin–Leff, Dennis C. Vacco, New York State Atty. Gen., New York State Dept. of Law, New York City, for Ford Motor Co., intervenor-defendant.

## MEMORANDUM DECISION

PARKER, District Judge.

### *INTRODUCTION*

In 1987 Congress amended the Clean Water Act to address the threat to nearby surface waters of pollution from stormwater runoff. Under regulations implementing the Act, discharge from commercial or industrial activities which disturb more than five acres of land require a stormwater permit. 33 U.S.C. § 1342(p). In this case plaintiff, the City of New York, tests compliance with those permit requirements and with the adequacy of construction techniques intended to control stormwater runoff from a proposed 240 acre golf course development in Somers, New York.

Tersely stated, the City contends that the stormwater control plans are inadequate and, therefore, violate the law. Should development occur, the City believes significant damage to its drinking water supply will result. The golf course's designers maintain that their plans are "state of the art," that they comply with permit guidelines and that no impairment to the City's drinking water supply will result from the construction or operation of the golf course.

Thus, issue is joined in this citizen suit brought under Section 505 of the Clean Water Act against Defendants Anglebrook Lim-

ited Partnership, Somers Golf Associates, Mitsui Fudosan (New York), Inc., Kajima International, Inc., Doe 1 and Doe 2 ("Defendants" or "SGA"). The City's basic claim is that the Stormwater Pollution Prevention Plan ("SWPPP" or the "Plan") for the proposed project violates an effluent standard under Section 402(a) of the Act. Construction has not started and the City seeks injunctive relief and civil penalties. See 33 U.S.C. § 1342(a).

Plaintiff's request for a preliminary injunction was joined with a trial on the merits from February 27, 1995 through March 9, 1995. Pursuant to 52(a) of the Federal Rules of Civil Procedure, the Court sets forth below its findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. The Parties

New York City provides drinking water to approximately nine million City and State residents. The defendants intend to build a private golf club, the Anglebrook Golf Club, with membership limited to 300, in Somers, New York in Northern Westchester County, adjacent to the Amawalk Reservoir and two to three miles upstream of the Muscoot Reservoir, both of which are part of the City's Croton Reservoir system, a major part of its water supply.

#### B. The Site

From the latter half of the nineteenth century until 1989, approximately seventy-five percent of the site, or 180 acres, was used exclusively for agriculture. This use necessitated the application of horticultural chemicals to row crops planted in exposed soil and resulted in the generation of stormwater unregulated by the permit system now in place. Since 1989, when SGA entered into a conditional contract to purchase the property, the property has not been used. Under applicable zoning regulation, farming is an "as of right" use and agriculture could presumably resume at any time.

All stormwater runoff from approximately 230 acres drains through the two on-site wetlands, which encompass 52.5 acres, before entering two on-site watercourses. These two watercourses are an unnamed tributary to the Plum Brook and one of the headwaters of the Angle Fly Brook. Runoff from 230 acres of the site must traverse fifty acres of on-site wetlands and then flow between two and three miles through ponds and the brooks themselves, before entering the Muscoot Reservoir. Water from the remaining approximately ten acres located in the northwestern corner of the property drains into the storm drainage system for a neighboring road before entering the Amawalk reservoir.

Approximately 230 of the 240 acres of the site consists of Paxton and Woodbridge Soil on slopes ranging from three to fifteen percent which, according to the Westchester County Soil survey, has a "slight to moderate potential for erosion." Two small areas of the site, one on the eastern part, the other on the west, together comprise about ten acres and contain Paxton and Charlton–Chatfield Soil at a fifteen percent slope, which according to the Survey, has severe erosion potential. Much of the area where this type of soil is located consists of rock outcropping which does not erode. Approximately 137 acres of the 240 acre site consists of undeveloped forest land.

#### C. Pollution in the Muscoot and Amawalk Reservoirs

New York City's drinking water supply is unfiltered and of very high quality. The Muscoot and Amawalk Reservoirs are part of the City's 590 billion gallon reservoir system. These reservoirs have come under pressure from pollution associated with development in the reservoir drainage areas. The quality of the water in the reservoirs depends on the cleanliness of the streams that feed them. Pollutants carried in stormwater runoff include phosphorus. Phosphorus occurs naturally, and it is not claimed that construction activity will generate or otherwise involve the use of phosphorus, rather, that phosphorus already present in nature and in the soils at the site will cling to sediment which may, as a result of construction activities, enter the on-site streams which ultimately flow into the City reservoirs. Phosphorus has been shown to cause excessive algae growth, and sediment, which, among other things, impairs

aquatic ecosystems by causing cloudiness and may also act as a carrier for other pollutants.

The City contends that the concentration of phosphorus in the Amawalk and Muscoot Reservoirs apparently now exceeds the maximum concentration set forth in state standards, and has caused these reservoirs to be eutrophic, i.e., they suffer from excessive growth or nuisance blooms of algae. Algae occur naturally. They bloom in the late summer and die as water temperature drops in the fall. Because of the presence of algae, the reservoirs have lower than desirable concentrations of dissolved oxygen and higher than desirable concentrations of iron and manganese, even though their overall quality remains high. If not controlled, algae may, at some unspecified point in the future, produce toxins which are harmful to fish, aquatic invertebrates and mammals. Excessive excretions from algae impair the taste, color and odor of water. If not watched, the progressive deterioration of the water's quality will, over time, lower its oxygen content and generate sediment that releases iron and manganese which further impair the taste, color and odor of water.

The City claims that the project's plans are deficient and any additional stormwater runoff—no matter the amount—will, by exacerbating this problem, violate the Clean Water Act and entitle it to pre-construction injunctive relief. SGA's position is that its plans are imaginative, effective ones that comply with relevant guidelines, that the site is spatially so far removed from the reservoir systems and so well insulated by wetlands, forests, streams, ponds, etc. as well as by a myriad of protective features incorporated into the project that no degradation of the City's water supply will occur during construction or operation of the golf course and that the City's predictions of harm are ungrounded, unlikely and speculative.

### D. *Project History*

This is not the first proceeding in which the City has expressed its objections to the project, and, in particular, to its potential impact on the City's water supply. Since 1991, the City has unsuccessfully litigated the adequacy of SGA's plans in various environ-mental proceedings. The project previously experienced a full environmental review pursuant to the New York State Environmental Quality Review Act ("SEQRA"). SGA submitted a Draft Environmental Impact Statement in October 31, 1990 and a Final Environmental Impact Statement in July, 1991.

In January, 1992, the Town of Somers Planning Board (the "Board"), acting as lead agency under SEQRA, adopted a comprehensive SEQRA Findings Statement which made detailed findings and which concluded that neither the construction nor the operation of the golf course would have any significant impact on soil or water quality. The Board granted final approval in November, 1993 and the Somers Zoning Board of Appeals granted a zoning variance in June 1992.

The Clean Water Act is to some extent self-policing. It prohibits discharge of any pollutants into the nation's waters except pursuant to specific authorization. 33 U.S.C. § 1311(a). Under the Act, discharge resulting from activities which disturb more than five acres require a permit. 33 U.S.C. § 1342(p). Pursuant to § 402(a), National Pollutant Discharge Elimination System (NPDES) permits can be issued to particular entities, allowing them to discharge limited amounts of pollutants into surface waters. 33 U.S.C. § 1342(a). Further, § 402(b) permits each state to implement the Clean Water Act through its own permit program as long as the program conforms to federal guidelines approved by the EPA administrator. 33 U.S.C. § 1342(b). The EPA administrator has authorized the New York Department of Environmental Conservation ("the DEC") to issue and enforce General Permits to discharge.

Entities covered by the Act and requiring a permit file Notices of Intent to be covered along with required plans. Coverage is then automatic. The holder of a state NPDES permit is subject to both state and federal enforcement actions for failure to comply with the permit. 33 U.S.C. §§ 1319, 1342(b)(7). In the absence of federal or state enforcement, private citizens may commence civil actions under § 505 against any person alleged to be in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a)(1).

Section 505 defines an effluent standard or limitation to include, among other things, the discharge of any pollutant except as provided in the Act and a violation of a permit condition violates the Act. 33 U.S.C. § 1365(f)(1), (6). If the citizen prevails in an enforcement action, the court may enforce the effluent standard or limitation, order injunctive relief, and impose civil penalties. 33 U.S.C. § 1365(a).

On April 29, 1992, SGA submitted a Joint Permit Application. In addition to an NPDES permit, the golf project required other permits, including a Freshwater Wetlands permit under Article 24 of the New York State Environmental Conservation Law since the runoff from the construction activity would pass through a wetlands, a Protection of Waters Permit under Article 15 of the New York State Environmental Conservation Law, and a Water Quality Certification under Section 401 of the Clean Water Act, 33 U.S.C. § 1341.

In New York the DEC has issued a State Pollution Discharge Elimination System General Permit (the "General Permit") which requires that permittees prepare a SWPPP which must include detailed descriptions of plans for erosion and sediment controls, monitoring, and recordkeeping.[1] The General Permit enforces these standards by a Duty to Comply Requirement, which obligates owners to comply with terms of the SWPPP. Under the Permit, "any permit noncompliance constitutes a violation of the Clean Water Act ... and is grounds for an Enforcement Action."[2]

In the months following the April 1992 submission to the DEC of the Joint Permit Application, SGA revised its plans to reflect the DEC's comments and criticisms. On September 28, 1992, DEC published a Notice of Complete Application which initiated a public comments period until November 6, 1992. At that time, the City opposed the application for a wetlands permit, on much the same grounds advanced here—namely that the plans did not include adequate erosion and sedimentation control measures and generally did not properly address stormwater runoff.

Notwithstanding the City's opposition on May 10, 1993 the DEC issued Defendants a Joint Permit, including a Wetlands Permit. Approval, however, was conditioned upon Defendants' implementation of a Stormwater Management Program which had been reviewed and approved by the Town of Somers.

Subsequently, the City appealed the May 10, 1993 decision to the New York State Freshwater Wetlands Appeals Board ("the FWAB"). There, the City sought to enjoin construction of the Project and to invalidate the Freshwater Wetlands permit on the grounds that Defendants' proposed erosion and sedimentation controls were inadequate. In connection with the FWAB hearings, SGA submitted their SWPPP, which was substantially the same then as it is now. The FWAB held hearings on the potential adverse impact of construction activities on adjacent wetlands. It affirmed the DEC's decision, and found, specifically, that the SGA's plans were sufficient to protect the wetlands and watercourses on-site during construction and that it would be highly unlikely that horticultural chemicals to be used on the completed Golf Course would enter the wetlands. Because it did not have jurisdiction, the FWAB did not directly address any of the City's objections under the Clean Water Act. Because of the topography of the site, stormwater pollution would degrade the wetlands long before it could reach the City's water supply.

### E. *Procedural History*

On March 29, 1994, the City sent Defendants a Notice of Intent to Sue letter which alleged deficiencies in the SWPPP and contended that the SWPPP, as it existed at that time, would violate the General Permit and pose a threat of contamination to the City's water supply. See 33 U.S.C. § 1342(p).

---

1. The DEC's permit imposes the same obligations on the permittee as the EPA permit. 57 Fed.Reg. 44412, 22 ("Standard Permit Conditions").

2. See General Permit § VA.

On September 16, 1994, Defendants filed its Notice of Intent with a statement that construction would commence on September 20, 1994 pursuant to the General Permit. The Defendants also filed an amended SWPPP which was essentially the same as the SWPPP filed earlier in the year. Due to the pendency of this lawsuit, construction has not begun. Defendants anticipate that their construction, if commenced, would last about thirteen months.

The City filed its complaint on October 5, 1994. On October 13, this Court issued a temporary restraining order. The parties stipulated that the order would remain in effect until the resolution of the City's motion for a preliminary injunction. The order was lifted on April 12, 1995.

### F. Defendants' SWPPP

#### 1. The General Permit SWPPP Requirements

As we have seen, the City's principal objections to the project is that the SWPPP fails to conform to the requirements of the General Permit.[3]

■ An issue of immense importance to this litigation is just how the standards of the General Permit should be interpreted. The General Permit sets out "Guidelines" to govern the preparation of an SWPPP and this case turns, in large part, on whether the Guidelines are sign posts or hitching posts. The City contends that the Guidelines are mandatory and plans that fall short of full compliance violate the Clean Water Act. The Defendants, on the other hand, view the Guidelines as aspirational. Unfortunately, the resolution of this critical issue is facilitated by neither rule nor precedent.

The City points to numerous provisions throughout the Guidelines which require permittees to address specific items in their SWPPPs. The City argues that presence of the word "shall" throughout Part III is a clear mandate in the "language of command." *American Telephone & Telegraph v. Federal Communications Commission*, 978 F.2d 727, 735 (D.C.Cir.1992). There is a certain comfort in construing the Guidelines as fixed rules because the existence of departures could then be identified and analyzed in a relatively straight-forward manner.

A closer reading of the General Permit, however, reveals that the regulations governing the contents of an SWPPP are cast in considerably more open-textured terms than the City would concede. Part III of the General Permit, states that the plans should be prepared in accordance with "good engineering practices." General Permit, Part III at 7. In its description of various sediment and erosion control and stormwater management practices, the General Permit requires that permittees prepare plans which "conform to" or are "implemented in a manner consistent with" those measures. See General Permit, Part III D.2.a at 10; Part III D.2.c at 12. Further, the Appendices which set forth in more detail various stormwater runoff prevention approaches are self-entitled "Guidelines"—not requirements. See General Permit, Appendix D, E and F. Moreover, each Appendix explains that its purpose is to "provide guidance" and each includes the proviso that it is "not fixed and inflexible" but is to be applied in a manner which considers the "particular facts and circumstances of a particular project." See General Permit, Appendix D; Appendix E; and Appendix F.

In view of this text and context, we find that the Guidelines are intended to be flexible rules which contemplate—and indeed require—applicants to exercise good engineering practices, informed by professional judgement and common sense. This interpretation best harmonizes permit compliance with the practicalities and realities of con-

---

3. Part III of the General Permit sets forth general requirements for SWPPPs. In addition, Appendices D and E more specifically set forth technical standards for pollution prevention measures to be included in the SWPPPs, the conditions under which particular measures may be used, and detailed design specifications for the measures. Appendix E also addresses erosion and sediment controls during construction. Appendix D sets forth technical standards for the stormwater management on the site once construction is complete.

struction and landscape architecture. The preparation of a SWPPP contemplates the interaction of many disciplines: wetland biology, biology, biochemistry, engineering, agriculture, agricultural engineering, turfgrass studies, landscape architecture, liminology, soil science, hydrology, architectural history and horticulture. The Guidelines tacitly recognize the practical difficulties of synthesizing these areas by leaving space for professional judgement.

In reviewing the SWPPP at issue in this litigation, the Court is, therefore, obliged to determine if SGA exercised that professional design judgement well within the perimeters of the Guidelines. To do that, we examine the City's varied objections to the SWPPP.

## 2. The City's General Objection

■ The City initially contends that the SWPPP contains insufficient information even to permit an evaluation of whether it complies with the General Permit.[4] The SWPPP, however, consists of voluminous texts, including maps, diagrams, and extensive explanatory material, as well as underlying data, detailed drawings and contrary to the City's position, the plans do indeed include sufficient detail to permit evaluation, as, if nothing else, the trial of this action demonstrated.[5]

## 3. Erosion and Sediment Control Measures

During rainfall once construction has started, there is always a danger that previously stabilized soil might be disconnected and that it might be washed away and eventually contaminate nearby waterbodies. The Permit prohibits any construction activity which will increase "offsite impacts" from this kind of contamination, which it defines as erosion and sedimentation. To comply with the Permit, the SWPPP must, therefore, include both erosion and sediment controls because neither by itself is completely effective in preventing stormwater pollution. Erosion controls, the "first line of defense," [6] prevent attached soil from disconnecting. Sediment controls, "the second line of defense," [7] prevent the disconnected soils from entering and ultimately blending with streams or other waterbodies. The City objects to both SGA's erosion and sediment controls.

### a. Erosion Control—The Five Acre Rule

■ The General Permit requires that erosion control on a construction site be accomplished by, among other things, limiting the amount of soil exposed [8] at any one time to five acres. According to the City, SGA does not meet this requirement.

Under SGA's plans, the work site is divided into twelve areas that can be separately

4. The City of New York called two witnesses, Dr. Michael A. Principe and James D. Benson. They are both employees of the New York City Department of Environmental Protection. Principe received a Bachelor of Science degree in Natural Resources from Cornell University, a Master of Science degree in Environmental Science from State University of New York College of Environmental Science and Forestry and Master and Doctor of Philosophy degrees in Biology from the City University of New York Graduate School and University Center.

 Benson is a Project Manager for Environmental Programs Sources Division and Bureau of Water Supply and Wastewater Collection of the DEP. He received a Bachelor of Science degree in Environmental Management from the State University of New York at New Paltz and is a certified erosion and sediment control specialist.

5. Defendants pointed out the specific items of information which the City had claimed were absent. For example, the City had claimed that the SWPPP did not include information concern-

ing Site limitations and development constraints although it is included in the soil map and the Site analysis map Sheets S–2.1 and S–2.2 in the SWPPP. The City also claimed that temporary and permanent erosion and sediment control facilities intended to be used during construction of the Golf Course were not included even though they are set forth on Sheet C–5 of the SWPPP and Appendix B, Proposed Developed Drainage Conditions Map, and Sheet SP–4.0 through 4.10 and SP–7.1 through 7.10, drawings C–1 through C–6a.

6. See General Permit Appendix E, § A.

7. See General Permit Appendix E, § B.

8. "Exposed soil" exists where naturally occurring vegetation that ordinarily keeps soil in place and prevents erosion has been removed or disturbed and has not been re-established or replaced by other protective materials placed on the disturbed soils.

managed and temporarily stabilized.[9] Thus, under SGA's SWPPP, in each instance where greater than five acres is exposed, that area will be "protected" by various erosion and sediment control measures such as diversions, earth dikes,[10] surface roughening and grading, interior silt fences, perimeter silt fences, sediment traps, sodding, temporary seeding and or mulching. SGA's erosion and sediment measures clearly fall within the Guidelines of the General Permit.

The City contends, however, that these measures are still deficient because they will not be implemented in sufficient time to prevent erosion. In support they rely upon the "Construction Time–Line Schedule" ("the Schedule")[11], included in the SWPPP, which sets forth dates and durations of proposed construction activities for each of the twelve work areas.

The City notes that according to the Schedule, the first three tasks to be performed on each construction section are: (1) clearing, grubbing, and topsoil stripping; (2) earthwork, including cuts and fills; and (3) fairway contouring and feature shaping. Each of these activities involves soil disturbance and will leave soils exposed. The City contends that the first erosion control methods will be implemented only after eight weeks of construction when defendants commence seeding and drainage measures. In support the City refers to the general performance note B(4)(g) on Sheet C–5 of the SWPPP. That note provides that in areas where work has ceased, or where it will temporarily cease for a period of twenty-one or more days, vegetation measures such as grassing and mulching should be implemented within twenty-four hours after the cessation of work.[12] Moreover, the City notes that the schedule describes all work as ongoing. Therefore, the City asserts, the performance note read in conjunction with the schedule suggests that Defendants have no satisfactory erosion controls.

SGA however demonstrated that the schedule was not an adequate indication of the actual timing of the project. First, the City's TRO precluded construction in accordance with the time line in the SWPPP. Having prevented performance under the original time line, the City cannot fairly fault SGA for being unable to follow it. The SWPPP, in any event, includes adequate erosion control measures and once the project and the effects of variables such as weather and construction progress are apparent, the contractors could realistically determine when, and under what precise circumstances, otherwise adequate erosion control measures such as temporary stabilization or permanent seeding should be used.

#### b. Erosion Control—Sodding

The City strenuously objects to the use of sod as an erosion control method

---

**9.** Defendants presented five witnesses, Andrew V. Tung, Dr. A. Martin Petrovic, Roger Rulewich, Elizabeth Evans and Hiroshi Morimoto. Morimoto is the general manager of Defendant Anglebrook Limited Partnership and is in charge of Golf Club development, marketing and operations.

Tung is a landscape architect and site planner who supervised development of the plans for the Golf Course. Tung received his Bachelor of Arts in Architecture from Yale University and his Master of Landscape Architecture from the University of Virginia. He is a registered landscape architect in the states of New York, New Jersey, and Connecticut.

Petrovic is an associate professor of Turfgrass Science in the Department of Floriculture and Ornamental Horticulture at Cornell University. He holds a Doctorate degree from Michigan State University in Turfgrass Soil Science and Masters and Bachelor of Science degrees from the University of Massachusetts in Turfgrass

Management. Petrovic is an expert in turfgrass science and has authored 20 research journal articles and more than 40 research papers relating to the impacts of horticultural chemicals and turfgrass.

**10.** See Section F.3.e., "erosion controls—diversions," *infra*.

**11.** The General Permit requires:

A record of the dates when major grading activities occur, when construction activities temporarily or permanently cease on a portion of the site, and when stabilization measures are initiated shall be included in the Plan. General Permit at Part III.D.2.a.

**12.** This requirement in the SWPPP for temporary stabilization within twenty four hours exceeds the guidelines in the General Permit, which require stabilization only within fourteen or fifteen days after work stops.

claiming that under the Guidelines, areas with slopes steeper than 2:1 cannot be stabilized with grasses, and those areas require special design and stabilization considerations that must be adequately shown on the plans.[13] The City argues that SGA's use of sod violates the Guidelines because sod is a grass. SGA demonstrated that while sod is grass, it does not function as a grass in the context of stabilization. Grass is considered inadequate for stabilization because no roots are established when it is seeded and mulched and thus, when rain falls on a slope, the newly seeded grass will wash away. Sod, on the other hand, is cut and laid into the earth and therefore it attaches and remains attached during rainfall. Consequently, we find that sod is a suitable erosion control method, having certain undeniable advantages over grass.

### c. Erosion Controls—Diversions

■ Another form of erosion controls are diversions which are channels designed to intercept and convey stormwater. The City contends that the diversions as shown on the SWPPP are inadequate because they are located below or in the midst of disturbed areas of soil and consequently will not adequately channel the stormwater. The City argues that this defeats the purpose of division: to direct clean storm water away from exposed soils. Nevertheless, SGA's plans, include diversions which are located above the disturbed slopes and, which therefore, function as a suitable erosion control method.

The City also asserts that the design of diversions in the SWPPP does not match the design detail for a diversion contained in New York Guidelines. SGA's witnesses confirmed, however, that what the City believes to be "diversions" are actually "earth dikes" and were designed in accordance with the New York Guidelines.[14] This confusion stems from the inconsistent nomenclature in the various reference guides for stormwater pollution prevention measures. Defendants had prepared this section of their SWPPP prior to the publication of the General Permit and thus had labelled the "earth dikes" as "diversions" in accordance with the Westchester County Best Management Practices manual.[15] The function of earth dikes is to convey sediment-laden water to control structures such as sediment basins or sediment traps during the course of construction. In any event, the design and location of the diversions falls within the Guidelines.

### d. Sediment Controls—Silt Fences [16]

The General Permit provides:

Sediment control practices/measures, where necessary, should be designed to protect the natural character of rivers, streams, lakes, coastal waters or other waterbodies on-site and minimize erosion and sedimentation off-site from the start of land disturbance activities to establishment of permanent stabilization.[17]

■ SGA's SWPPP contemplates the use of silt fences [18] as part of their erosion and sediment control plans, in addition to, and after completion of, other stabilization meth-

---

13. The New York Guidelines for Urban Erosion and Sediment Control ("The New York Guidelines") SB.49 provide:

slopes that are to be stabilized with grasses shall not be steeper than two to one and when slopes exceed two to one, special design and stabilization consideration are required and shall be adequately shown on the plans.

14. New York Guidelines at JA.5.

15. Westchester County Best Management Practices at 5.27.

16. Defendants' plans indicate that perimeter silt fences, outside the area of Golf Course construction, will be installed prior to the commencement of work. While these do not serve as a sediment

control function, they will serve as an erosion control function because they will protect the work area from runoff which may come off the road onto the site. Perimeter silt fences would also slow the velocity of water moving into the area, therefore diminishing its erosion potential.

17. General Permit, Appendix E § B.

18. A silt fence is a sediment barrier filter cloth which is a kind of fiberglass mesh through which the water would pass trapping the sediment that comes with it.

Defendants' silt fences are twenty-four inches high above the surface of the ground. They are attached to stakes that are buried twenty-four inches into the ground.

ods such as vegetation or mulching. The City contends that many of the silt fences will fail to provide adequate sediment controls because they will be installed many weeks after the soil has been disturbed. SGA's proof established that before the interior silt fences are installed, areas below the fences will have been stabilized by the other erosion control methods such as land grading [19], surface roughening, mulching and vegetation.

The City also claims that the design of the silt fences violates the General Permit. The Guidelines contain limitations on the maximum allowable slope and length for the area from which the stormwater may run off into a silt fence.[20] These limitations are, of course, designed to reflect the fact that the velocity of runoff on a slope increases with the steepness of the slope. To reduce runoff velocity, the New York Guidelines specify that the steeper the slope, the less distance stormwater may safely be allowed to travel before reaching a sediment barrier. If these limitations are not followed, sediment barriers are significantly less effective and may fail entirely.

The City contends that nine drainage areas in defendants' plan exceed the silt fence numeric limitations. Resolving this issue is complicated because neither the Guidelines nor the General Permit sets forth the method for measuring slope length.[21] In support of its contention that numeric limitations are exceeded, the City asserts that allowable slope length should be measured after determining the entire distance from the watershed boundary to the silt fence.

Under this method, it is undisputed that SGA's silt fences do not comply. The City's calculations, however, do not take into account the actual topography of the slopes at the particular site in question. SGA, on the other hand, contends that the slope length is more properly measured from the point at which the ground begins to slope downward to the silt fence. Under this approach, which makes somewhat more practical sense, the slope length Guidelines are not violated, because the length of slopes between fences are not greater than recommended by the Guidelines for all of the silt fences, with the exception of one silt fence in the south central portion of the Site. And SGA testified that seven other protection measures [22] would ultimately correct this deviation should an on-site problem arise.

### 4. Stormwater Management Controls

The next major area of disagreement surrounds SGA's plans to control stormwater once the golf course is constructed. Appendix D of the General Permit sets forth standards for design and implementation of stormwater management facilities. These facilities are intended to control post-stormwater quality by attenuating peak flows "to minimize or alleviate flooding and stream bank erosion associated with land development and urbanization." Generally, as an effect of construction, the developed land surface becomes impervious, that is, it loses some of its capability to absorb water. As a result of this imperviousness, the soil is less likely to absorb any pollutants that are introduced into the area. Stormwater Facilities divert, store and treat runoff from impervious soil so that pollutants can be removed before any tainted runoff can reach nearby watercourses.

A principal measure for maintaining stormwater quality is treatment of the first flush of runoff. The General Permit defines the first flush of runoff as "one half inch of runoff per acre of land which has been made

---

**19.** Land grading is moving soil around to change the contour of the earth, i.e. with a bulldozer or any kind of machine. The New York Guidelines lists it as a soil stabilization method. New York Guidelines at 2.8.

**20.** New York Guidelines at 5A.19.

**21.** For example, if the steepness of a slope is 2:1, or 50%, the maximum allowable slope lengths contributing to a silt fence is 50 feet. If the steepness is 3:1, or 33%, the maximum allowable slope length is 75 feet. For a steepness of 4:1, or 25%, the maximum allowable slope length is 125 feet. For a steepness of 5:1, the maximum allowable slope length is 175 feet. For all slopes that are flatter than 5:1, the maximum allowable slope length contributing to a silt fence is 200 feet. New York Guidelines at 5A.19.

**22.** See pp. 922–923 infra.

more impervious from pre-development conditions ... through construction activities." Consequently, the Permit requires that permittees "provide for control" of the first flush where imperviousness has increased. The City contests the adequacy of SGA's plans in this area.

### a. Increase in Curve Number

The increase in imperviousness is estimated by the "runoff coefficient," an SWPPP requirement, which is defined as "the fraction of total rainfall that will appear at the conveyance as runoff." "Curve numbers" as defined by the U.S.D.A. Soil Conservation Service provide an index of the amount of runoff from an area for a given an amount of rainfall. A curve number is thus a runoff coefficient. The City claims that the first flush is not treated appropriately because, the curve number set forth in the SWPPP increases from 71.4 for the Site's existing condition to 74.4 for the developed Site. In context, this means that during a one inch storm a curve number of 74.4 would theoretically produce .017 more inches, a two-inch .086 inches more of than would been generated by 71.4 curve number. Although this increase is obviously troublesome, it is adequately addressed in the SWPPP.

### b. First Flush Control

The General Permit describes three primary methods of first flush control. These, in descending order of preference, are: infiltration, retention and extended detention. Primary structures remove approximately 40–80% of the pollutants in stormwater runoff. The General Permit also sets forth "adjuncts" or secondary structures to control first flush. These include vegetated swales, filter strips, and natural depressions. Stormwater management adjuncts are in-

tended to be used in conjunction with these primary control structures to control the first flush from a given land area.[23]

The controversy over this point is a sharp one. According to the SGA, it did not select the City's infiltration methods because the site is not deep enough to comply with the General Permit. Indeed, Appendix D to the General Permit contemplates those infiltration measures only in areas where there are more than four feet of depth to the seasonal groundwater.[24] Instead, SGA has adopted a state of the art Turfgrass Management Plan which was specifically designed for this site. The Turfgrass Management Plan curbs runoff in two ways. First, the turfgrass itself provides an effective means of absorbing contaminants in stormwater runoff. Second, Dr. Petrovic, the designer of the Turfgrass Plan, selected pesticides and fertilizers, that were less likely to run off during storm events. We are satisfied that, for this site in particular, SGA's Turfgrass Plan, is the more effective stormwater management control. This conclusion is bolstered by the fact that the City's experts did not inspect the 240–acre site prior to making their allegations and inspected the site for only two hours prior to reaching any of their conclusions.

SGA's SWPPP provides for other primary structures of first flush control. The plan includes four ponds, two of which are extended detention ponds, that is, they collect water to control discharge rates and provide gravity-driven settling of pollutants. These two ponds are intended to manage stormwater flows from two-year, ten-year, and one hundred-year storms as required by the General Permit.

SGA also proposes other stormwater management facilities: vegetated swales, vegetat-

---

**23.** The General Permit sets forth in the "Hierarchy of Methods for Managing Stormwater Quality":

> The following stormwater management systems, summarized in descending order of preference should be used to control the first flush when designing stormwater facilities. The practices are: (1) infiltration, (2) retention, and (3) extended detention. When a stream supporting a cold water fishery is the object of protection, extended detention should be

placed ahead of retention in the hierarchy. A combination of these practices, including stormwater management adjuncts (number 4 in the hierarchy) may be used to achieve first flush control objectives. The project sponsor/applicant should provide justification for the rejection of practices listed as priority 1, 2 or 3.

General Permit App.D. § 3.C.

**24.** See General Permit, Appendix D § 4(A)(2)(d).

ed buffers, filter strips oil/water separators and biofilters. The City challenges the efficacy of the biofilters. In rough terms, a biofilter is a ditch with foliage which intercepts overland runoff and filters it. While it is undisputed that biofilters would not serve alone as infiltration devices, they are intended to supplement or enhance the functioning of the vegetation or the vegetated filters on the site. The City claims that biofilters do not qualify as primary structures for first flush runoff. SGA, however, does not intend biofilters to serve as primary stormwater management structures nor have they relied on their effectiveness in their stormwater quality calculations. The biofilters are simply one of a number of stormwater management measures included in the plan.

Under the Guidelines, the fifty acres of on-site wetlands will also provide an acceptable method of stormwater management. Wetlands are noted for their ability to cleanse water moving through them to a water course. Used in conjunction with primary structures, the wetlands give the water "a final polishing."[25] The wetlands that surround the Angle Fly tributary are particularly effective because they contain a large amount of organic soils. In sum, we find that SGA's Turfgrass Management Plan, its detention ponds, its other proposed stormwater management adjuncts and the existing on-site wetlands provide sufficient stormwater management under the General Permit.

### 5. Thermal discharge

■ The City contends that Defendants' SWPPP does not protect against thermal pollution from stormwater. According to the City, discharges from the biofilters are likely to be warmer than the ambient water temperature because water in the biofilters is likely to heat up quickly and 3.2 acres of tree canopy will be removed thereby increasing ground and runoff temperatures. The City contends that when the heated water enters the Plum Brook, which is designated a trout

stream, it will violate state regulations for thermal discharges.[26]

The City, however, failed to prove this contention. Tung, a designer of the SWPPP, testified that water in the biofilter would be shaded by vegetation. Other SGA witnesses confirmed this. Further, runoff from the former treed areas will be routed through grassed swales, vegetated biofilters, wooded filter strips, detention ponds and on site wetlands before leaving the site, and thus it is not likely to experience any measurable change in temperature.

In addition, SGA demonstrated that even if the temperature of the water being discharged from the wetlands increased slightly, any such increase would be attenuated before it reached the portion of the Plum Brook designated for trout, which is one thousand feet downstream, let alone the City reservoir which is miles downstream.

### 6. Inspection and Monitoring

■ The SWPPP requires inspection of its prophylactic measures at least once a week and within twenty-four hours after every storm event of ½ inch or greater.[27] The General Permit does not require testing of surface water quality to insure its objectives are met but requires "in the field" inspection of the erosion and sediment control measures required by the SWPPP. SGA demonstrated that the visual inspections contemplated would detect sediment controls that have failed (e.g., silt fences that have toppled) or yield evidence that sediment had migrated across the site in stormwater.

The City argues that observations are only useful in indicating that pollution had occurred in the storm, but they would not in themselves reveal the defects in the SWPPP that caused the pollution. The testimony, however, showed that the monitoring SGA contemplates, while, perhaps, not perfect, is nonetheless "state of the art" in the field of sediment and erosion controls and any fail-

**25.** General Permit, App.D. § 4(B)(2)(a).

**26.** See Title 6 of the New York Codes, Rules and Regulations, part 704, which is incorporated by reference in the General Permit.

**27.** Under the General Permit, inspections of the site, including structural control measures, are required to occur every seven days and "within 24 hours of the end of a storm that is .5 inches or greater." General Permit Part III D.4.

ures in erosion or sediment control measures would be readily apparent and could be identified quickly by such inspection. Moreover, Defendants' experts testified that if measures fail in the field, they can be corrected quickly, within twenty-four hours in most cases.

Defendants' Water Resources Monitoring Program calls for testing of the on-site streams and ponds for various chemicals before construction and once per month between April and October during grow-in of the golf course as well as two times per year during the first five years of golf course operations and at a reduced frequency thereafter. The Water Resources Monitoring Program will monitor the levels and use of pesticides in surface waters. The Town will require Defendants to discontinue pesticide use if pesticide levels are detected in surface waters. The program also requires baseline measurements of sediment in Valley Pond, which is immediately downstream from the Site along the Angle Fly Brook, and requires remediation if sedimentation in that waterbody increases.

Finally, as a result of prior concerns expressed by the Town of Somers, SGA and the Town agreed the Town would hire a qualified professional monitor during construction. SGA has paid $163,000 to the Town to fund the cost of this professional and has posted a $2.3 million erosion and sediment control bond to insure remediation of any damage. Neither of these measures is required by the General Permit.

The City argues, however, that the posting of a performance bond, in and of itself, does not safeguard the City's reservoirs and the feeding streams. The beneficiary on the bond would be the Town of Somers, not the City, and the bond is only to "include the cost of remediation of any siltation damage to Valley Pond found to be due to development of the golf course." The bond would not, the City contends, fund remediation work in the Amawalk or Muscoot Reservoirs. The City's analysis is correct. But while the City might not be the beneficiary on the bond, its exis-

tence, nonetheless suggests strong incentive to SGA to avoid environmental damage.

### G. Increase in Amount of Phosphorous in Stormwater Runoff During Construction

Among the City's most serious concerns is that the overall amount of phosphorous and consequently the amount of algal bloom will increase because stormwater runoff from the site will increase. In addition, the City argues that stormwater runoff will increase substantially because, with the development of the golf club, curve numbers will increase in nearly all portions of the 185 acres under construction.[28]

SGA, however, showed that its SWPPP employs numerous measures to control sedimentation and erosion and that even if one measure fails, other measures such as earth dikes and perimeter silt fences as well as naturally existing vegetated land, would arrest sedimentation before it reaches a wetland. SGA's expert testified, and I credit her testimony, that the following would happen if a major storm caused a series of problems during construction:

> "[If the silt fence] is knocked over by the rush of stormwater coming down. What happens to this stormwater? It continues to move down the slope ... it hits one of the diversion channels ... let's assume that diversion channel is not functioning properly. It goes across that diversion channel. It is not carried to where it's supposed to be. It hits another row of silt fence ... That silt fence falls down. It then enters an area that is undisturbed vegetation according to the plan, a vegetative filter strip ... It gets across that area of undisturbed vegetation. It hits another layer of silt fence. If that has failed, it would continue to travel. It will hit another diversion swale. If it travels down to the sediment trap and that sediment trap has not been maintained, it will in theory leave that sediment trap. It will enter another undisturbed vegetated area or filter strip. And if all of those measures

28. For example, in 1994 there were eighteen rainstorms of one inch or more at the site. The thirteen remaining storms of one inch or more during 1994 ranged between 1.06 and 1.72 inches.

have failed, it will hit another row of silt fence ... before entering a wetland. And ... one hundred feet of ... vegetated wetland will lie between that stormwater, which is carrying the sediment, and the stream which is a tributary to the Muscoot reservoir."[29]

The conclusion is mirrored by the prior determinations of the DEC and the FWAB that it is highly unlikely that construction activities would harm the wetlands which serve as effective natural filtration areas. Although we do not reach the question of whether the determination of the state agencies is conclusive, the potential discharges in question must, in most instances, pass through wetlands before passing down stream and eventually reaching City reservoirs and both the DEC and FWAB have concluded that the project will not adversely impact sensitive wetlands.

The City also argues that the amount of phosphorous in the runoff will increase as a result of the application of fertilizer to the golf course. No fertilizer is presently being applied to the site, but SGA intends to apply fertilizer, which contains phosphorous, in the seventh month of construction and throughout the operation of the golf club. Phosphorous in fertilizers dissolves in stormwater and, in the absence of adequate preventative measures, can migrate in runoff off-site. While the City established that fertilizers pose a theoretical risk to nearby watercourses, it failed to prove what, if any, amounts of phosphorous would leave the site as a result of construction, or that any phosphorous would actually reach the City's reservoirs.

### H. *Phosphorous and Pesticide Pollution During Operation of the Golf Course*

 The City contends that during operation of the Golf course, SGA's pesticide program will add to the discharge of large quantities of pollutants into the on-site streams during storms. SGA intends to apply its pesticide program which lists many pesticides, including chlorpyrifos, PCNB, dicam-

ba, and 2, 4–D, which will be applied to the golf course. The City's concern stems from the potentially toxic or debilitating effects the pesticides will have on aquatic life and water courses, and the possibly carcinogenic or otherwise harmful effects on humans.

The vulnerability of the receiving waters, however, turns not merely on the types of pesticides but also on site specific considerations such as local climatic conditions, the depth to ground water, the properties of the soil, such as clay content, organic matter content, texture, structure, porosity, and soil moisture content.

Although the City presented no evidence that pesticide application for golf course operations specifically harmed a surface water body, it presented evidence of the general environmental harms of improper pesticide use. Studies performed in other regions of the country of pesticides applied to golf courses or turfgrass found that high concentrations of 2, 4–D and dicamba run off in stormwater, particularly when a storm occurs within days of an application of the pesticides. One study found 2, 4–D concentrations as high as ten times the federal maximum contaminant level ("MCL") for drinking water and fifteen times New York State's drinking water MCL. This study also found the concentration of dicamba in runoff twenty-four hours after its application was over six hundred times the concentration permitted in groundwater in New York State. Another study found 2, 4–D concentrations in runoff three days after pesticide application equal to three and four times state and federal MCLs.

The City argues that because pesticides will be applied thirty four times a year, and because its application will exceed 1400 pounds per year[30], pesticides are likely to be applied just prior to a storm event, and as a result, toxicologically significant quantities of pesticides will likely run off at these times. However, the City's proof was incomplete. Its argument is based in large part, on studies from other parts of the country which

**29.** Evans, Direct Testimony at 40–41.

**30.** Because the club will have a "championship" golf course, it will have a very low tolerance for damage to the turf caused by pests.

have far different climates or studies from similar regions which do not test turfgrass.[31]

SGA, on the other hand, demonstrated that pesticide and fertilizer use on the completed Golf Course is highly unlikely to have any impact on the on-site watercourses and even less likely to impact the quality of the City's water supply. SGA's expert based his opinion on the Turfgrass Management Program, which he developed by selecting pesticides and fertilizers that are "slow", that is, least likely to run off and which are applied only to the extent needed. Studies of turfgrass systems from similar climates in Maryland, Rhode Island and Pennsylvania, established that to meet the City's runoff predictions, pesticides had to be applied substantially in excess of what is set forth in SGA's program.

SGA demonstrated that there are no studies or empirical research showing an instance where a Golf Course has had an adverse impact on a surface water body or a surface water reservoir, and that virtually every pesticide and fertilizer proposed for use on the Golf Course is approved for use on food crops and could be used, without regulation, if agriculture resumed on the site.

\* \* \*

In conclusion, the Court finds that the Defendants have not violated the General Permit. It is apparent from the text of the General Permit that the design requirements at issue are Guidelines. They accommodate themselves to the sound professional judgement that is necessarily required in any complex project driven by the vagaries of weather, topology, soil condition and the unforeseen or unforeseeable construction contingencies.

While the SWPPP in question may not be completely immune from criticism of the wisdom of certain of its design choices, considered as a whole, the SWPPP is a carefully conceived plan that falls well within the boundaries of good engineering design judgement. If it is implemented in accordance with its design, the proof at trial showed no real threat of real harm to the City's water supply and certainly no danger of immediate irreparable harm.

SGA's SWPPP contains adequate erosion and sediment controls. The Plans adequately describe the erosion and sediment controls set forth in the General Permit. Defendants have established that in each instance where greater than five acres is exposed, that area will be protected by adequate erosion and sediment controls including diversions, earth dikes, surface roughening and grading, interior silt fences, sediment traps, sodding, temporary seeding and mulching. The SWPPP also provides adequate measures for maintaining stormwater quality. As indicated above, the first flush of runoff is treated adequately through detention ponds, biofilters, vegetated filter strips, swales and vegetated buffers and its Turfgrass Management System.

Finally the City failed to prove that as a result of deficiencies within the SWPPP, the stormwater discharged during and after construction will cause, or contribute to, a contravention of water quality standards for phosphorous and turbidity. Defendants have sufficiently guarded the watershed from deterioration with detailed structural and back-up measures, buttressed by monitoring and inspection to ensure compliance. Further, Defendants have demonstrated that any variations in their SWPPP from the Guidelines

---

**31.** Principe, for example relied on a study done in Texas and Oklahoma which compared native grasses with conventional and nonconventional tillage and cropping systems with no discussion of turfgrass programs. Sharpley et al., "The Transport of Bioavailable Phosphorous in Agricultural Runoff," *J.Environ.Qual.* (Vol. 21. Jan.–March 1992). Principe also relies on a golf course study from Florida which addresses runoff from warm season grasses, which have a higher potential for runoff than cool season grasses. Defendants, however, intend to use cool season grasses.

While the City did cite to one article which discusses turfgrass programs, that article considered conditions, such as clay soil and slopes at nine and fourteen percent, which are different from those at the Site. Harrison, Watschke, et al., "Nutrient Pesticide Concentrations in water from Chemically Treated Turfgrass," *Pesticides in Urban Environment* (1992). In response, Petrovic cited a report to the U.S. Geological Survey which found that the Watschke study was not applicable to this golf course because of the slope and soil conditions of the study.

do not amount to a violation of the General Permit. Unquestionably there is a possibility that other design approaches might work just as well. However, these possibilities do not detract from the adequacy of SGA's SWPPP which reflects a rather consistent fidelity to the Guidelines of the General Permit.

■ Finally, even if we were to find that SGA's plan contains some deficiencies, the City has failed to prove that any of those deficiencies will cause irreparable harm to the City's reservoirs or to its drinking water. Without that proof, the City is not entitled to injunctive relief.

### CONCLUSIONS OF LAW

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251–1386 (1986 & Supp. I 1994). This Court has subject matter jurisdiction over this action pursuant to Section 505 of the Clean Water Act 33 U.S.C. § 1365(a), (f) Venue is proper in this court pursuant to § 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the site where the alleged violations occurred is within this District. Notice of this lawsuit was properly given pursuant to Section 505(b)(1)(A) of the Act 33 U.S.C. § 1365(b)(1)(A). The City is a citizen within the meaning of Section 505(g) of the Act, 33 U.S.C. 1365(g).

■ The City's position is that deficiencies in the permit create a sufficiently high likelihood of harm to drinking water to entitle it to injunctive relief. Injunctive relief, however, is not automatically available upon a finding of technical statutory violations, assuming *arguendo,* ones occurred. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). To prevail on a motion for a permanent injunction, the City must demonstrate a likelihood of success on the merits of its claim—a violation of the Clean Water Act and a sufficient likelihood of irreparable injury. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

■ To establish irreparable injury, there must be some actual, viable, presently-existing threat of serious harm—one that is not remote or speculative. *United States v. W.T. Grant Co,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). In other words, the City must show that the injury complained of is of such imminence that there is a " 'clear and present' need for relief to prevent irreparable harm." *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n,* 758 F.2d 669, 674 (D.C.Cir.1985) (quoting *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 307 (D.D.C.1976)), *aff'd,* 548 F.2d 977 (D.C.Cir.1976).

Plaintiff's first allegation of irreparable harm is that if the project goes forward in accordance with its current SWPPP, the inadequacies in Defendants' erosion and sediment controls in addition to its flawed stormwater management plan are likely to cause deterioration to the City's water supply system as a result of polluted stormwater discharges from the site during and after construction. The proof, however, simply did not support this conclusion. SGA proved that its SWPPP contained measures that were adequate to both prevent erosion and sedimentation and to manage stormwater runoff, SGA also demonstrated that, in most instances, several backup measures existed which would provide adequate prevention even if primary ones failed.

Irreparable harm under the Clean Water Act was addressed in *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). There, citizens sought an injunction to prohibit the United States Navy from discharging munitions into the Atlantic Ocean without first obtaining the requisite NPDES permit. While the District Court held that the Navy's discharge of munitions in the absence of a permit was, indeed, a technical violation of the Clean Water Act, it nonetheless declined to issue injunctive relief because the discharge did not result in any appreciable harm to the receiving waters. *Weinberger,* 456 U.S. at 307–08, 102 S.Ct. at 1800–01. The Court of Appeals vacated the District Court's order and directed the issuance of an injunction, reasoning that, regard-

less of the harmless results of the discharge, the Act imposed an absolute statutory obligation to stop any discharges of pollutants until the NPDES Permit had been issued. *Weinberger,* 456 U.S. at 311, 102 S.Ct. at 1802–03.

The Supreme Court reversed, taking special notice of the District Court's finding that the discharge was not resulting in any appreciable harm to the receiving waters. *Weinberger,* 456 U.S. at 320, 102 S.Ct. at 1807. Further it noted that the Court of Appeals had erroneously focused on the integrity of the permit process rather than on the integrity of the Nation's water. *Weinberger,* 456 U.S. at 314–15, 102 S.Ct. at 1804–05.

Similarly in *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Court imposed an injunction pursuant to the Alaska National Interest Land Conservation Act ("ANILCA"), 16 U.S.C. § 3120, to enjoin exploratory gas and oil drilling on the basis that "irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." *Amoco,* 480 U.S. at 545, 107 S.Ct. at 1404. The Supreme Court reversed:

> [T]he environment can be fully protected without this presumption. Environmental injury by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. Here, however, the injury to subsistence resources from exploration was not at all probable.

*Amoco,* 480 U.S. at 545, 107 S.Ct. at 1404.

Our Court of Appeals has had occasion to echo these conclusions within the context of various environmental statutes. In *Town of Huntington v. Marsh,* 884 F.2d 648 (2d Cir. 1989), *cert. denied sub. nom., Town of Huntington v. Stone,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990), the Court reiterated the *Weinberger* limitation for granting a permanent injunction in the context of the National Environmental Policy Act ("NEPA") and the Ocean Dumping Act. In that case, the Army Corps of Engineers designated a dumpsite in Long Island Sound in response to applications by owners and operators of marinas in Mamaroneck Harbor. *Town of Huntington,* 884 F.2d at 649. Both the District Court and the Court of Appeals concluded that the Corps had violated both the NEPA and the Ocean Dumping Act because of facial deficiencies in its Environmental Impact Statement. *Town of Huntington,* 884 F.2d at 654. Despite these violations, the grant of a permanent injunction was vacated and remanded because there was no evidence of environmental damage from the dumping. *Town of Huntington,* 884 F.2d at 654. See also *Conservation Society of Southern Vermont Inc. v. Secretary of Transportation,* 508 F.2d 927, 934 (2d Cir. 1974), *vacated on other grounds and remanded,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) ("Although the procedural requirements of NEPA must be followed scrupulously and cost or delay will not alone justify noncompliance with the Act, where the equities require, it remains within the sound discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred." (footnotes omitted)).

The lessons of these decisions are clear: The City must prove more than procedural permit violations in order to secure an injunction. The City argues that any SWPPP violation would directly and critically upset the Act's objective, thereby establishing the risk of irreparable harm. But in distinguishing between procedural and substantive violations, courts look to the substantive policy of the Act, which is, here, the protection and maintenance of our Nation's navigable waterways. *Amoco,* 480 U.S. at 542–53, 107 S.Ct. at 1402–03. See *United States v. City of Niagara Falls,* 706 F.Supp. 1053, 1059 (W.D.N.Y.1989) (court retains "power to deny an injunction where its issuances would not further the substantive policies underlying the Act"); *PIRG of N.J. v. Top Notch Metal Finishing Co.,* 26 ERC 2012, 2015, 1987 WL 44393 (D.N.J.1987) ("violation of effluent limitation, precisely that part of the [Clean Water Act] which is foremost concerned with furthering the underlying substantive policy" (quotations omitted)); *International Union v. Amerace,* 740 F.Supp. 1072, 1086 (D.N.J.1990) (violations of applicable federal and local discharge stan-

dards "are at the heart of the Clean Water Act [and] directly and critically upset the Act's objective"). No deficiencies in SGA's SWPPP were proved at trial which would undermine the Act's substantive policies and require injunctive relief.

 Quantifiable harm is, of course, not a prerequisite to irreparable harm. See e.g. *PIRG of N.J. v. Rice,* 774 F.Supp. 317, 329 (D.N.J.1991) ("Plaintiffs need not, as defendant suggests, show with scientific certainty that defendant itself has caused all the Damage to the environment."); *International Union,* 740 F.Supp. at 1086 (D.N.J.1990) ("if all the dischargers argued that their illegal discharges, by themselves, were too minimal to constitute irreparable injury, even though the totality of the discharges caused substantial irreparable harm plaintiff could not remedy the situation by seeking injunctive relief."). Nevertheless, the City is required to demonstrate how Defendants' plan will actually cause the discharge of pollutants into the City's water supply. The City clearly showed the harmful effects of pollution and the importance of stormwater control. It failed, however, to prove that Defendant's activities would cause any discharge of pollutants into the Amawalk and Muscoot Reservoirs or that anything Defendants proposed to do would impair the City's drinking water. The City's Motion for an Injunction is denied.[32]

### III. CONCLUSION

For the foregoing, reasons, this court finds in favor of the Defendants. Judgment shall be entered on behalf of the Defendants.

**SO ORDERED.**

---

**32.** Cases cited by plaintiffs involved the actual discharges of pollutants into the receiving waters. In *Top Notch,* for example, the court found irreparable harm "from the continued release into the Hackensack River of ... toxic chemicals at levels exceeding the legal limit by thousand fold" 26 ERC at 2015–16. Further, in that case, some of the discharged pollutants exceeded permitted levels by over five thousand percent and in one instance the discharge exceeded the limit by 33,0000 percent and over two thirds of the violations were more than one thousand percent

of the prescribed limit. *Top Notch,* 26 ERC at 2016. Similarly, in *International Union,* 740 F.Supp. at 1078, defendants exceeded discharge limitations for hexavalent chromium for over six years and also failed to report their violations. See also *PIRG of New Jersey v. CP Chemicals,* 26 ERC 2017, 2020 (D.N.J.1987) (in a period of six months defendant discharged highly toxic pollutants ranging from 1064% over maximum to 21,011% over maximum limitations on thirty-two separate occasions).